EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| Luis Samuel Negrón Castro y otros<br><br>Peticionarios<br><br>v.<br><br>Hiram M. Soler Bernardini, su esposa Marisol Portilla Delgado y la Sociedad Legal de Bienes Gananciales compuesta por ambos; Hospital Episcopal San Lucas Ponce; Bernardo Campos González, Hospital Español Auxilio Mutuo de Puerto Rico, Inc.; Beazly Group; The Medical Protective Company, SIMED; Puerto Rico Medical Defense Insurance; John Doe, Richard Roe<br><br>Recurridos | Certiorari<br><br>2025 TSPR 96<br><br>216 DPR ___ |

Número del Caso:  CC-2024-0466


Fecha:  6 de octubre de 2025


Tribunal de Apelaciones:

    Panel Especial


Representantes legales de la parte peticionaria:

    Lcda. Alexandra Bigas Valedón
    Lcdo. Gaspar A. Martínez Mangual


Representantes legales de la parte recurrida:

    Lcdo. Henry O. Freese Souffront
    Lcda. Angélica Rivera Ramos
    Lcda. Yadira H. Rosario Rosario
    Lcdo. Mariano Vidal Saenz
    Lcda. Nidia I. Teissonniere Rueda


Materia: Derecho de Seguros – Límites de responsabilidad dispuestos en la Ley de los Centros Médicos Académicos Regionales de Puerto Rico no son extensivos a las aseguradoras; interpretación de las cláusulas de las pólizas de seguro expedidas en el caso.


Este documento está sujeto a los cambios y correcciones del proceso de compilación y publicación oficial de las decisiones del Tribunal Supremo. Su distribución electrónica se hace como un servicio público a la comunidad.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | | |
|---|---|---|
| Luis Samuel Negrón Castro y otros<br><br>Peticionarios<br><br>v.<br><br>Hiram M. Soler Bernardini, su esposa Marisol Portilla Delgado y la Sociedad Legal de Bienes Gananciales compuesta por ambos; Hospital Episcopal San Lucas Ponce; Bernardo Campos González, Hospital Español Auxilio Mutuo de Puerto Rico, Inc.; Beazly Group; The Medical Protective Company; SIMED; Puerto Rico Medical Defense Insurance; John Doe, Richard Roe<br><br>Recurridos | CC-2024-0466 | Certiorari |

Opinión del Tribunal emitida por la Jueza Asociada Rivera Pérez.

En San Juan, Puerto Rico a 6 de octubre de 2025.

Nos corresponde interpretar y determinar si los límites de responsabilidad establecidos por la Asamblea Legislativa a favor de los Centro Médicos Académicos Regionales (CMAR) y su facultad docente son extensivos a sus respectivas aseguradoras. De igual manera, nos corresponde analizar si las cláusulas de las pólizas de seguro expedidas a favor del Dr. Hiram M. Soler Bernardini y el Hospital San Lucas constituyen "cláusulas de exclusión" que limitan la responsabilidad de estas aseguradoras, el Sindicato de Aseguradores para la

Suscripción Conjunta de Seguro de Responsabilidad Médico-Hospitalaria (SIMED) y Beazley Group, respectivamente.

Por los fundamentos que discutiremos, resolvemos que los límites de responsabilidad dispuesto en la Ley Núm. 136-2006, Ley de los Centros Médicos Académicos Regionales de Puerto Rico, 24 LPRA sec. 10035, *et seq.*, no son extensivos a las aseguradoras. Además, reiteramos las doctrinas de interpretación aplicable a los contratos de seguros y disponemos que erró el Tribunal de Apelaciones al concluir que la cláusula interpretada es una cláusula de exclusión.

## I.

Los hechos que dieron lugar a la presente reclamación en daños y perjuicios ocurrieron el 24 de abril de 2017, cuando el Sr. Luis Samuel Negrón Castro fue operado de la vesícula por el Dr. Hiram Soler Bernardini en el Hospital Episcopal San Lucas, en el municipio de Ponce. Posteriormente, se presentaron serias complicaciones en su salud, que no son necesario detallar, y fue intervenido por segunda ocasión por el Dr. Bernardo Campos González en el Hospital Auxilio Mutuo, falleciendo ulteriormente el 5 de julio de 2021.

Por estos hechos se instó una causa de acción en daños y perjuicios por alegados actos de impericia médico-hospitalaria.[1]

---

[1] La *Demanda* fue presentada el 9 de mayo de 2018 por el señor Negrón Castro, su esposa, la Sra. Sonia E. Lugo Ramos, la Sociedad Legal de Bienes Gananciales compuesta por ambos, y sus hijos menores de edad, N.A., V.S. y A.S.(en conjunto los demandantes), contra el Dr. Hiram M. Soler Bernardini, su esposa y la Sociedad Legal de Bienes Gananciales compuesta por ambos; el Hospital Episcopal San Lucas de Ponce; el Dr. Bernardo Campos González; el Hospital Español Auxilio Mutuo de Puerto Rico, Inc.; y sus respectivas compañías aseguradoras: Beazley Group; The Medical Protective Company; y Puerto Rico Medical Defense Insurance (codemandados). A esta

Luego de varios incidentes procesales, que no son necesarios consignar, el 22 de junio de 2022, el Dr. Soler, su esposa y la Sociedad de Bienes Gananciales por estos compuesta, presentaron una moción intitulada *Segunda moción solicitando se dicte Sentencia Parcial sobre los límites aplicable[s] al caso conforme dicha Ley*. En apretada síntesis, solicitaron que se determinara que, en caso de que el Dr. Soler resultara responsable por "algún tipo de responsabilidad monetaria", le serían aplicables los límites establecidos en la Ley Núm. 136-2006, Ley de los Centros Médicos Académicos Regionales de Puerto Rico, 24 LPRA sec. 10035, *et seq.*[2] Esta legislación —como se discutirá más adelante— extiende los límites dispuestos en el Artículo 2 de la Ley Núm. 104 de 29 de junio de 1955,[3] según enmendada, Ley de Reclamaciones y Demandas contra el Estado, a los CMAR, su facultad y estudiantes.[4] Adujeron que no existía controversia alguna en cuanto al hecho de que, en el tratamiento médico recibido por el señor Negrón Castro (Q.E.P.D.), participaron estudiantes y médicos en entrenamiento del programa de residencia en cirugía, y que el Hospital San Lucas es un CMAR, por lo cual les son aplicables los límites de responsabilidad dispuestos en la referida ley.[5] A esta solicitud, se unieron el Hospital San Lucas y su aseguradora Beazley Group.

---

demanda se le asignó el alfanumérico J DP2018-0133. Posteriormente, la *Demanda* fue enmendada en dos ocasiones: el 30 de enero de 2019 y el 30 de septiembre de 2021.

[2] Mediante esta legislación se crearon los CMAR.

[3] 32 LPRA sec. 3077.

[4] Véase Artículo 7 de la Ley Núm. 136-2006, 24 LPRA sec. 10035.

[5] Los demandantes contestaron a la referida moción dispositiva alegando que esta no cumplía con los requisitos de la Regla 36.2 (b)(2) de Procedimiento Civil. Además, indicaron que la evidencia presentada no era

El 11 de agosto de 2022, la Sra. Sonia Enid Lugo Ramos y la Sucesión del señor Negrón Castro[6] instaron *Moción solicitando Sentencia Sumaria Parcial* en la que peticionaron al foro de primera instancia que declarara que las aseguradoras SIMED y Beazley Group **no** podían beneficiarse de los límites de responsabilidad dispuestos en la Ley Núm. 136-2006. En particular, argumentaron que ni SIMED ni Beazley Group practican la medicina ni forman parte de un CMAR.

La aseguradora del Dr. Soler, SIMED, así como el Hospital San Lucas y su aseguradora Beazley Group, presentaron sus respectivas mociones en oposición. En resumen, alegaron que, **conforme a la póliza**, estos responden hasta aquellas cuantías que —en su día— fuesen responsables sus asegurados.

En consecuencia, ante los límites de responsabilidad dispuestos a favor de sus asegurados conforme a la Ley Núm. 136-2006, **estos responderían igualmente hasta dicho límite.** Incluso en su escrito SIMED argumentó que, de acuerdo con esta legislación, resultan "inmateriales" los límites establecidos en la póliza expedida a favor del Dr. Soler (PRM0010996), la cual dispone una cubierta de $100,000 por incidente médico y $300,000 por agregado.[7] Por su parte, Beazley Group expidió la póliza W144B3160401 a favor del Hospital San Lucas, la cual adelantamos establece unos límites de cubierta hasta $1,500,000 por incidente médico y $6,000,000 por agregado.[8]

---

suficiente para demostrar que al Dr. Soler y al Hospital San Lucas le eran aplicables los límites de responsabilidad.
[6] Surge del epígrafe que la sucesión está compuesta por Milisette Caridad Negrón Hernández, Nicole Enid Negrón Lugo, Víctor Samuel Negrón Lugo, la menor AGNL y su viuda, la Sra. Sonia Enid Lugo Ramos.
[7] Véase apéndice del recurso, pág. 552.
[8] Íd., pág. 570.

Evaluados los escritos presentados, el 13 de marzo de 2023, el Tribunal de Primera Instancia dictó Sentencia Parcial en la cual resolvió, "como cuestión de derecho que, a los codemandados, **Dr. Hiram Soler Bernardini** y el **Hospital Episcopal San Lucas** le son aplicables los límites dispuestos en la Ley Núm. 136-2006, <u>**no así a sus correspondientes**</u> <u>**aseguradoras**</u>, **SIMED** y **Beazley Group**".[9] El foro de primera instancia determinó como hechos incontrovertidos que el Dr. Soler, a la fecha de los hechos, tenía un nombramiento académico para la enseñanza de médicos residentes del Programa de Cirugía del Hospital San Lucas, y que el señor Negrón Castro fue atendido en dicho hospital, el cual está designado como un CMAR conforme a la Ley Núm. 136-2006, *supra*. Añadió que, en el tratamiento médico recibido por este, intervinieron médicos residentes con nombramiento académico en la Escuela de Medicina de Ponce.

En consecuencia, concluyó que el Dr. Soler y el Hospital San Lucas son *acreedores* de los límites de responsabilidad concedidos por la Ley Núm. 136-2006, *supra*. Por otra parte, resolvió que dicha legislación no se extiende a sus aseguradoras, ya que estas no cumplen con el propósito que persigue la ley. **De ordinario, las aseguradoras responden hasta los límites de responsabilidad estipulados en las pólizas**. Así las cosas, concedió el petitorio sumario parcial solicitado por el Dr. Soler y la Sucesión del señor Negrón Castro.

---

[9] Negrilla y subrayado en el original.

Inconformes con lo decretado por el foro primario, SIMED solicitó determinaciones de hechos adicionales y reconsideración al palio de las Reglas 43.1 y 47 de las Reglas de Procedimiento Civil, 32 LPRA Ap. V. A este pedido, se unieron el Hospital San Lucas y Beazley Group. **Argumentó SIMED que la interpretación del Tribunal de Primera Instancia menoscaba las cláusulas contractuales que forman parte del contrato de seguros**. A tales fines, sostuvo que las pólizas establecen que solo resarcirán por la cantidad que el asegurado venga "legalmente obligado" a resarcir, hasta el grado de su responsabilidad.

El 3 de octubre de 2023, el Tribunal de Primera Instancia dictó una *Resolución*, acogiendo el hecho propuesto por SIMED, y de esta manera incorporó al dictamen la cláusula siguiente:

> THIS IS KNOWN AS A "CLAIMS MADE" POLICY, EXCEPT TO THE EXTENT AS MAY BE PROVIDED HEREIN, THIS COVERAGE IS LIMITED TO CLAIMS ARISING FROM THE RENDERING OF OR FAILURE TO RENDER PROFESSIONAL SERVICES ON OR AFTER THE RETROACTIVE DATE STATED IN THE DECLARATIONS AND FIRST MADE AGAINST THE SYNDICATE WHILE THIS POLICY IS IN FORCE. PLEASE READ THE POLICY CAREFULLY.
>
> In consideration for the payment, in reliance upon the statement in the declarations and application attached thereto and made a part hereof and subject to all the terms of this policy, the Syndicate agrees with the insured as follows:
>
> II. Coverage Agreements
>
> The Syndicate will pay on behalf of the Insured with respect only to his practice within the Commonwealth of Puerto Rico:

> Coverage A- Individual Professional Liability
> All Sums which the Insured shall **become legally obligated to pay as damages** because of injury to which this policy applies caused by medical incident, occurring on or after the retroactive date, for which a claim is first made against the Insured and reported to the Syndicate during the policy period, arising out of the rendering of or failure to render professional services by the Insured as a physician, surgeon or dentist. (Negrilla suplida).

En dicho dictamen interlocutorio, el Tribunal de Primera Instancia reiteró que dicha cláusula no es contraria a lo previamente resuelto. Además, dispuso que, si bien SIMED será responsable del pago de las cantidades que su asegurado pueda estar "legalmente obligado a pagar como indemnización por daños", ello no es fundamento para invocar, a su favor, los límites dispuestos en la Ley Núm. 136-2006, *supra*.[10]

En desacuerdo todavía, el Hospital San Lucas y, su compañía aseguradora, Beazley Group, presentaron ante el Tribunal de Apelaciones un recurso de apelación.[11] En el mismo, reiteraron que los límites de responsabilidad establecidos en la ley que creó los CMAR son extensivos a las compañías aseguradoras de los profesionales de la medicina, que de forma directa se benefician de ellos. Asimismo, alegaron que el foro recurrido erró **al ignorar las cláusulas contractuales contenidas en la póliza de seguro acordada entre estas entidades**, las cuales limitaban su responsabilidad hasta la cuantía por la que fuera legalmente responsable el asegurado. De igual forma, SIMED presentó ante el foro apelativo

---

[10] Véase apéndice del recurso, págs. 883-888.
[11] Al cual le fue asignado el alfanumérico KLAN202300984.

intermedio un *Escrito de apelación*, en el que reiteró el mismo planteamiento.[12]

Consolidados ambos recursos, y evaluados los alegatos de ambas partes, el Tribunal de Apelaciones dictó *Sentencia*, mediante la cual "revocó" la *Sentencia Parcial* dictada por el foro primario. En síntesis, el foro apelativo intermedio confirmó el dictamen recurrido, al concluir que los límites de responsabilidad solo se aplican a aquellos sujetos expresamente señalados en la Ley Núm. 136-2006, *supra* y en el Artículo 41.050 del Código de Seguros, 26 LPRA sec. 4105. No obstante, **modificó el dictamen del foro primario al resolver que las normas de libre contratación permiten a las aseguradoras y a sus asegurados pactar cláusulas que limiten la responsabilidad** "… hasta las cantidades que sus asegurados estén obligados a pagar".[13]

El foro intermedio razonó que las cláusulas de cubierta (*coverage agreement*) incorporadas en las pólizas de SIMED y Beazley Group, constituyen "cláusulas de exclusión", pactadas entre el Dr. Soler y el Hospital San Lucas, para limitar la cuantía "que sus asegurados estén obligados a pagar".[14] En consecuencia, validó dichas cláusulas por entender que nuestro ordenamiento "no prohíbe que una aseguradora limite su propia responsabilidad por debajo del monto de la cubierta que ofrece".[15]

---

[12] Al cual le fue asignado el alfanumérico KLAN202300987.
[13] Véase KLAN202300984 cons. KLAN202300987, pág. 29.
[14] Íd., págs. 28-29.
[15] Íd., pág. 29.

Insatisfechos con el dictamen emitido por el Tribunal de Apelaciones, la Sra. Sonia Enid Lugo Ramos y la Sucesión del señor Negrón Castro acudieron ante esta Curia mediante una petición de *certiorari*. En el presente recurso, plantean que el foro intermedio cometió el siguiente error:

> Erró el Tribunal de Apelaciones al resolver que SIMED y Beazley Group *solo responderán*, en el caso de recaer una sentencia que determine que el Dr. Soler Bernardini y el Hospital San Lucas incurrieron en acciones u omisiones culposas, *por las cantidades que estos están legalmente obligados a pagar*, según lo pactado en sus respectivos contratos de seguro, todo ello en contravención a las disposiciones aplicables del Código de Seguros. (Subrayado en el original).

La aseguradora SIMED, el Hospital San Lucas y su aseguradora Beazley Group presentaron sus respectivos alegatos. Estas reiteran que, conforme al contrato de seguros suscrito entre las partes, y a los principios establecidos en el Código de Seguros, **las cantidades máximas por las que, en su día, responderán en el presente pleito, son las dispuestas en la Ley Núm. 104, *supra*; a saber, $75,000 por persona o $150,000 dependiendo de la cantidad de personas o causas de acción. Alegaron que dichas cuantías reflejan el límite de su obligación, ya que responden únicamente hasta el grado de responsabilidad de sus asegurados, "no más".**[16]

Evaluados los argumentos de las partes, procederemos a exponer la normativa aplicable.

---

[16] Véase Alegato de SIMED, pág. 17. Alegato del Hospital San Lucas y Beazley Group, pág. 3.

II.

**A.** *Mecanismo de la Sentencia Sumaria*

La Regla 36 de Procedimiento Civil regula todo lo relacionado con la moción de sentencia sumaria. Dicho mecanismo procesal se utiliza en aquellos litigios en los que no existen controversias genuinas de hechos materiales y, por consiguiente, no resulta necesaria la celebración de un juicio en su fondo, en la medida en que solo resta por dilucidar determinadas controversias de derecho. *BPPR v. Zorrilla y otro*, 214 DPR 329, 338 (2024). Véase *Acevedo y otros v. Depto. Hacienda y otros*, 212 DPR 335, 349 (2023). Se considera un hecho material aquel que puede afectar el resultado de la reclamación de acuerdo con el derecho sustantivo aplicable. *Bobé et al. v. UBS Financial Services*, 198 DPR 6, 20 (2017).

El propósito que persigue el mecanismo de la sentencia sumaria es que los pleitos civiles se resuelvan de forma justa, rápida y económica. *SLG Fernández-Bernal v. RAD-MAN et al.*, 208 DPR 310, 334-335 (2021). Véase *León Torres v. Rivera Lebrón*, 204 DPR 20, 43 (2020). Para lograrlo, la Regla 36.3 de Procedimiento Civil, 32 LPRA Ap. V, establece el contenido y los requisitos de forma que deben observarse, tanto en la solicitud de sentencia sumaria presentada por la parte promovente, como en la oposición que pueda presentar la parte promovida. *León Torres v. Rivera Lebrón*, supra, pág. 43.

La sentencia sumaria solicitada será dictada inmediatamente:

> si las alegaciones, deposiciones, contestaciones a interrogatorios y admisiones ofrecidas, en unión a las declaraciones juradas, si las hay, u otra

evidencia demuestran que no hay controversia real sustancial en cuanto a algún hecho esencial y pertinente y que como cuestión de derecho el tribunal debe dictar sentencia sumaria a favor de la parte promovente. Regla 36.3 (e) de Procedimiento Civil, *supra*. Véanse, además, *Rodríguez García v. UCA*, 200 DPR 929, 941 (2018); *Roldán Flores v. M. Cuebas et al.*, 199 DPR 664, 676 (2018).

Como regla general, una moción de sentencia sumaria no procederá cuando: (1) existan hechos materiales y esenciales controvertidos; (2) haya alegaciones afirmativas en la demanda que no han sido refutadas; (3) surja de los propios documentos que se acompañan con la moción una controversia real sobre algún hecho material y esencial; o (4) no proceda como cuestión de derecho. *Fernández-Bernal v. RAD-MAN et al.*, *supra*, págs. 335-336. Véase *S.L.G. Szendrey-Ramos v. Consejo Titulares*, 184 DPR 133, 167 (2011).

Por otra parte, la Regla 36.4 de Procedimiento Civil, 32 LPRA Ap. V., establece que:

> [s]i en virtud de una moción presentada bajo las disposiciones de esta regla no se dicta sentencia sobre la totalidad del pleito, no se concede todo el remedio solicitado o se deniega la moción, y es necesario celebrar juicio, será obligatorio que el tribunal resuelva la moción mediante una determinación de los hechos esenciales y pertinentes sobre los cuales no hay controversia sustancial y los hechos esenciales y pertinentes que están realmente y de buena fe controvertidos, […].

Ahora bien, este Tribunal ha pautado reiteradamente que los foros revisores están llamados a "examinar el expediente *de novo* y verificar que las partes cumplieron con las exigencias" pautadas en la Regla 36.3 de Procedimiento Civil, *supra*. *Fernández-Bernal v. RAD-MAN et al.*, *supra*, págs. 337-338, citando a *Rivera Matos et al. v. Triple-S et al.*, 204 DPR 1010, 1025 (2020). Para ello, es indispensable "analizar

tanto los documentos que acompañan la solicitud como los documentos de la oposición para determinar si existe o no controversia de hechos". *Rosado Reyes v. Global Healthcare*, 205 DPR 796, 809 (2020). En ese proceder, si se concluye que los hechos materiales están verdaderamente incontrovertidos, entonces corresponde revisar si el foro primario aplicó correctamente el Derecho. *Fernández-Bernal v. RAD-MAN et al.*, *supra*, pág. 338. Véase *González Santiago v. Baxter Healthcare*, 202 DPR 281, 291 (2019).

### B. *El Contrato de Seguros*

En virtud de la trascendencia pública, importancia, complejidad y efecto en la economía de nuestra sociedad, la Asamblea Legislativa ha considerado apropiado reglamentar el negocio de los seguros en una ley especial, conocida como el Código de Seguros de Puerto Rico,[17] el cual ha sido objeto de múltiples enmiendas a lo largo del tiempo. A su vez, dicha legislación creó el cargo del Comisionado de Seguros, a quien corresponde reglamentar todos los asuntos relacionados al negocio de seguros en Puerto Rico. Incluso, tiene la facultad de llevar a cabo las investigaciones y exámenes que estime necesarios para asegurar el cumplimiento de las disposiciones del Código, su reglamento y las órdenes que se hayan emitido. Artículo 2.030 del Código de Seguros, 26 LPRA sec. 235.

En cuanto a su forma y contenido, el contrato de seguro debe constar por escrito, en documento privado, denominado como la póliza.[18] En este se expresan **los derechos y**

---

[17] Véase Ley Núm. 77 de 19 de junio de 1957, Código de Seguros de Puerto Rico, según enmendada,26 LPRA sec. 101 *et seq*.
[18] Véase Artículo 11.140 de la Ley Núm. 77, 26 LPRA sec. 1114.

**obligaciones de las partes contratantes**, el nombre del asegurador y del asegurado, la designación del objeto asegurado, la naturaleza de los riesgos cubiertos, **la cantidad asegurada, la declaración de la prima, y las condiciones** y exclusiones correspondientes al seguro. R. Cruz, *Derecho de Seguros*, San Juan, Ed. J.T.S., 1999, págs. 3-4.

Respecto a los derechos y obligaciones, tanto del asegurador como del asegurado, estos quedan establecidos en la sección referente a las condiciones. En dicha sección, el asegurador condiciona su obligación indemnizatoria y establece, además, sus derechos y los del asegurado. Íd., pág. 11.

Por otra parte, las exclusiones —a diferencia de las condiciones— **limitan o excluyen el alcance de las cubiertas, y específicamente excluyen aquellos riesgos o peligros de la cubierta general que el asegurador así exprese en esta parte de la póliza.** Íd., págs. 10-11.

Por otro lado, en repetidas ocasiones hemos resuelto que el contrato de seguro es el contrato de adhesión por excelencia, ya que este es **redactado íntegramente por el asegurador en todo su contenido, sin que el asegurado tenga la oportunidad de negociar su contenido.** Íd., pág. 12. Véase, además, Artículo 11.140, inciso (2) del Código de Seguros, 26 LPRA sec. 1114; S.*L.G. Francis-Acevedo v. SIMED*, 176 DPR 372, 386 (2009); *Zequeira v. CRUV*, 83 DPR 878, 880 (1961).

Es un principio hermenéutico del derecho de seguros que "[t]odo contrato de seguro deberá interpretarse globalmente, a base del conjunto total de sus términos y condiciones, según

se expresen en la póliza y según se hayan ampliado, extendido, o modificado por aditamento, endoso o solicitud adherido a la póliza y que forme parte de ésta". Artículo 11.250 del Código de Seguros, 26 LPRA sec. 1125. "Es precisamente mediante la interpretación global del contrato de seguro y no de manera aislada que se logra obtener la verdadera intención de las partes". R. Cruz, *op. cit.*, pág. 36.

En cuanto a esta materia, en *Barreras v. Santana*, 87 DPR 227 (1963), dictaminamos que "[l]as dudas se resolverán de modo que se realice el propósito de la póliza [...] y no se favorecen las interpretaciones sutiles para evadir la responsabilidad [...]". Íd., pág. 235. Asimismo, la doctrina requiere, no solo que interpretemos la póliza a favor del asegurado y en contra de la aseguradora que redactó la póliza, sino que la interpretemos a favor de darle efecto a las cubiertas pactadas. Véase Couch, *On Insurance*, 3ra ed., Thompson Reuters, 2025, Vol. 1, sec. 219.

De otra parte, el Código de Seguros vela porque el contrato sea redactado, no solamente incluyendo cláusulas uniformes, sino también, en cuanto al contenido de las pólizas en general, dejando la libre contratación solo en **aquellas situaciones que no afecten el aspecto sustantivo del contrato**, las cuales pertenecen a un régimen muy personal dentro del contrato de seguro. R. Cruz, *op cit.*, págs. 12-13. Sobre este particular, el Artículo 11.110 del Código de Seguros, 26 LPRA sec. 1111, en su inciso (1), dispone que:

> [n]inguna persona expedirá, entregará o usará ningún formulario básico de póliza de seguro, excepto el de fianza ni ningún formulario de solicitud cuando

se requiera solicitud por escrito, ni aditamento impreso ni formulario de endoso, **a menos que previamente haya sido presentado al Comisionado y aprobado por éste [...].**[19]

Así, "[n]inguna persona deberá expedir ni entregar ningún formulario a sabiendas de que el mismo no ha sido aprobado por el Comisionado". Íd., inciso (4). Además, es menester recalcar, que el Comisionado también tiene la facultad de desaprobar un formulario de póliza, solicitud, aditamento o endoso, o retirar su aprobación:

> [s]i contiene o incorpora por referencia cualesquiera cláusulas inconsistentes, ambiguas o que se presenten a error, o excepciones y condiciones que falazmente afecten el riesgo que se tiene la intención de asumir en la cubierta general del contrato". Artículo 11.120, inciso (3) del Código de Seguros, 26 LPRA sec. 1112.

En suma, todo contrato de seguros debe expresar claramente los actos asegurados por la póliza, fuente de responsabilidad frente al asegurado. En su típica redacción (typical coverage provision for a professional liability E&O policy obligates the insurer) se encuentra:

> To pay on behalf of the Insured **all sums which the Insured shall become legally obligated to pay as damages** … by reason of any act, error or omission arising out of professional services rendered or which should have been rendered, as specified [in the Insured Profession Section] of the Declarations". (Negrilla suplida). New Appleman on Insurance Law Library Edition, Vol. 4, Sec. 25.03[7], págs. 25-46 (Rel. 13-9/2015).

Al respecto, Theresa A. Guertin y Tracy Alan Saxe explican lo siguiente:

> This "legally obligated" requirement was intended to avoid coverage for obligations that the insured has voluntarily assumed. That is, the scope of coverage is limited to only those obligations

---

[19] Negrilla suplida.

that the law recognizes and enforces between parties. Logically, these legal obligations should include not only judgments rendered by courts of law, but also any valid liability claim once it arises. (Citas omitidas). Theresa A. Guertin y Tracy Alan Saxe, *Insurance Coverage of Construction Disputes*, 2d ed., Thompson Reuters, 2025, sec. 6:7.

En virtud de lo anterior, distintos tribunales han interpretado la cláusula de "legally obligated to pay as damages" refiriéndose al requisito de responsabilidad extracontractual y no en referencia a cantidad alguna. Véanse, por ejemplo, *Terrebonne v. State Farm Fire and Cas. Co.*, 491 So. 2d 73 (LA. Ct. App. 1st Cir. 1986) (Injuries sustained by the insured's adult son when he tried to lift a railroad jack while helping his father construct a boat were not compensable under the father's homeowner's liability policy, where there was no negligence or fault by the insured father, so that the insured was not "legally obligated" to pay any damages)[20]; *Federated Serv. Ins. Co. v. Alliance Constr.,LLC*, 282 Neb. 638 (Neb.2011), 805 N.W.2d 468 (2011) ("Under a policy providing liability coverage, the insurer has a duty to indemnify an insured who becomes legally liable to pay damages for a covered occurrence"); *Detroit Water Team Joint Venture v. Agricultural Ins. Co.*, 371 F.3d 336 (6th Cir. 2004) ("Thus, Detroit Water Team has the burden of proving that it was "legally obligated" to pay the "sums" that it incurred in repairing the damaged electrical system. The phrase "legally obligated" necessitates "more than inchoate or potential liability".).

---

[20] "The clause in question is clear and explicit. The generally prevailing meaning of legally obligated or a legal obligation is defined as "[a] duty imposed by law....", Black's Law Dictionary, 806 (5th ed. 1979)". Íd.

Antes bien, la controversia que ha levantado esta cláusula en las jurisdicciones de Estados Unidos ha sido si tal cláusula incluye responsabilidad por daños contractuales o si debe limitarse a responsabilidad extracontractual. Véanse, por ejemplo, *Vandenberg v. Superior Court*, 21 Cal.4th 815 (1999)[21]; *Sigma Chi Corp. v. Westchester Fire Ins. Co.*, 587 F.Supp.2d 891 (N.D. Ill. 2008).

En concordancia, destacamos que el Capítulo 20 del Código de Seguros dispone sobre los articulados aplicables a los *Seguros contra Accidentes*. Entre estos se establece que "[l]a responsabilidad del asegurador **no excederá de aquella dispuesta en la póliza**, y el tribunal deberá determinar no solamente la **responsabilidad del asegurador**, sino que también la cuantía de la pérdida". Artículo 20.030 del Código de Seguros, 26 LPRA Sec. 2003. Es decir, una vez establecido el grado de responsabilidad y la cuantía de los daños, la aseguradora responderá únicamente hasta el monto dispuesto en la póliza.[22] Además, la persona que sufra los daños y perjuicios tendrá, a su opción, una acción directa contra el asegurador **conforme a los términos y limitaciones de la póliza**, acción que podrá ejercitar contra el asegurador solamente o contra éste y el asegurado conjuntamente. Íd.

C. *El Contrato de Seguro médico-hospitalario*

---

[21] "Second, we must determine whether a commercial general liability (CGL) insurance policy that provides coverage for sums the insured is "legally obligated to pay as damages" may cover losses arising from a breach of contract". Íd.

[22] En aquellos casos en que el monto de la sentencia exceda el total del riesgo cubierto por una póliza de impericia médico-hospitalaria, el tribunal podrá autorizar el pago a plazos de esa parte de la sentencia que le corresponde al profesional o institución de cuidado del asegurado. Véase Artículo 41.100 del Código de Seguros, 26 LPRA sec. 4110.

El Código de Seguros exige que todo profesional de servicios de salud e institución médica presente anualmente prueba de su responsabilidad financiera, la cual debe cubrir **no menos de $100,000 por incidente** y **$300,000 en agregado por año**. Asimismo, el Comisionado podrá requerir límites hasta un máximo de $500,000 por incidente médico y un agregado de $1,000,000 por año en los casos de instituciones de cuidado de salud. Artículo 41.050 del Código de Seguros, 26 LPRA sec. 4105.

Este deber se puede satisfacer mediante: (i) el establecimiento de un fondo de garantía; (ii) la obtención de un seguro de responsabilidad profesional médico-hospitalaria expedido por un asegurador que participe del mercado de libre competencia o SIMED; o (iii) una combinación de ambas formas. El referido contrato de seguros constituirá la cubierta de seguros de responsabilidad profesional para cubrir riesgos de daño por culpa o negligencia por impericia profesional (*malpractice*) para profesionales de servicios de salud e instituciones de cuidado de salud. Artículo 41.020 inciso (7) del Código de Seguros, 26 LPRA sec. 4102.[23]

En lo aquí pertinente, el Código de Seguros dispone claramente, cuáles profesionales e instituciones de cuidado de salud **están exentos de esta obligación**. Artículo 41.050 del Código de Seguros, *supra*. De igual manera, el legislador clasificó expresamente a quiénes se les **concede inmunidad** y a quiénes se les **otorgaron límites de responsabilidad**. Así, el

---

[23] Véase, además, *Díaz Ayala et al. v. E.L.A.*, 153 DPR 675, 690 (2001).

referido articulado taxativamente establece cuáles profesionales e instituciones de salud **no** podrán ser incluidas como parte demandada en una acción civil de daños por culpa o negligencia por impericia profesional (*malpractice*), y a quiénes les resultan aplicables los límites de responsabilidad. Íd.

Por otro lado, la Ley Núm. 103-2011 se aprobó para enmendar el Artículo 41.050 del Código de Seguros, *supra*, el Artículo 2 de la Ley Núm. 104, *supra*, y el Artículo 7 de la Ley Núm. 136-2006, *supra*, que se discutirán más adelante. En esta medida, el legislador entendió necesario aclarar quiénes están sujetos a los límites de responsabilidad dispuestos en la Ley Núm. 104, *supra*. Véase, Exposición de Motivos de la Ley Núm. 103-2011.

Así, en el referido Artículo 41.050, *supra*, se incorporó el siguiente lenguaje que, en lo aquí pertinente, dispone:

> [s]e aplicarán los **límites de responsabilidad** que la Ley Núm. 104 del 29 de junio de 1955, según enmendada, impone al Estado Libre Asociado de Puerto Rico, en similares circunstancias, en los siguientes escenarios: […]".

El inciso (vii) del referido articulado incluye:

> a los Centros Médicos Académicos Regionales de Puerto Rico, sus estudiantes y miembros de facultad **cuando recaiga sentencia** por actos constitutivos de impericia médica hospitalaria (*malpractice*) **cometida por sus estudiantes y miembros de su facultad** en el desempeño de sus funciones docentes; […]. (Negrilla suplida).

En relación con la controversia presentada es importante destacar que la inmunidad supone la **inexistencia** de una causa de acción, mientras que la imposición de límites de responsabilidad meramente establece **un tope a la compensación**

que la parte demandante debe recibir. Por lo cual, hemos establecido que ambas figuras, aunque persiguen un fin similar, son excluyentes, dado que la aplicación de una necesariamente excluye la aplicación de la otra. *Ortiz et al. v. Hosp. San Lucas et al.*, 205 DPR 222, 228-229 (2020). Véase *Rodríguez Figueroa et al. v. Centro de Salud*, 197 DPR 876, 884-885 (2017).

De igual manera, hemos resuelto que la Ley Núm. 136-2006, *supra*, ―a la cual hacemos referencia a continuación― tuvo el efecto de imponer límites monetarios a la responsabilidad de los CMAR y a los facultativos que ejercen labores docentes en estos, y no el de **conferirles inmunidad absoluta** ante cualquier reclamación por daños y perjuicios por impericia médica. *Ortiz et al. v. Hosp. San Lucas et al.*, *supra*, págs. 229-230. Véase *Rodríguez Figueroa et al. v. Centro de Salud*, supra, págs. 884-885.

En *Quílez-Velar et al. v. Ox Bodies, Inc.,* 198 DPR 1079 (2017), atendimos una Certificación Interjurisdiccional sobre el asunto de la inmunidad y los límites de responsabilidad, y allí reiteramos que:

> Si un **codeudor** es inmune por razón de una ley que así lo prescribe, su porción de la deuda no debe formar parte de la **deuda solidaria**.
> Asimismo, si un **codeudor** está cobijado por un límite de responsabilidad estipulado por la ley, …, pues **su porción de la deuda no puede rebasarse del límite establecido**. (Negrilla suplida). Íd., págs. 1087-1088.[24]

---

[24] Destacamos que, en el pleito citado, una vez celebrado el juicio, el Jurado concluyó que Ox Bodies respondía a los demandantes y otorgó daños que totalizaron $6,000,000. El Jurado **adjudicó la responsabilidad** por los daños de la manera siguiente: **20% de la responsabilidad a Ox Bodies,** ($1,200,000); 80% al Municipio ($4,800,000), que ya no formaba parte de la demanda y 0% a la señora Quílez Bonelli.

Las inmunidades, o los límites de responsabilidad que se establecen por ley, son excepciones, o defensas, personales que puede presentar **un deudor**. Así, éste puede servirse de la inmunidad o el límite de responsabilidad estatutaria de **otro codeudor** en la porción de la deuda de la cual sea responsable ese otro. Íd., pág. 1089.

D. *La Ley Núm. 136-2006*

Como principio cardinal básico de hermenéutica, el texto de la ley no se debe menospreciar so pretexto de honrar su espíritu. *Martínez v. Ofic. del Gobernador*, 152 DPR 586 (2000). Si una disposición específica de una ley requiere interpretación, los tribunales debemos siempre considerar cuáles fueron los **propósitos** perseguidos por la Asamblea Legislativa al aprobarla y el fin social que los inspiró. *Asoc. Fcias. v. Caribe Specialty et al. II*, 179 DPR 923 (2010). Véase *Vázquez v. A.R.P.E.*, 128 DPR 513, 523 (1991). Nuestra determinación debe atribuirle un sentido lógico que asegure el resultado que originalmente se quiso obtener y suplir posibles deficiencias, solo cuando sea necesario. *Alonso García v. S.L.G.,* 155 DPR 91 (2001).

En el marco de sus facultades, nuestra legislatura aprobó la Ley Núm. 136-2006, *supra*, **con el propósito expreso de**

---

"[…], el Municipio ostentaba una defensa personal de límite de responsabilidad estatutaria. […] por lo cual los demandantes no podían recuperar dinero adicional del Municipio en el foro federal, […]. En cuanto al **codeudor solidario** …, Ox Bodies, éste podía oponer la defensa personal del Municipio **en la parte de la deuda que el Municipio fuese responsable**, entiéndase, [el] ochenta por ciento (80%)". Íd., págs. 1089-1090.

Ante la defensa que, por disposición de ley, poseía el Municipio, Ox Bodies perdió su derecho de nivelación. "Por lo tanto, la magistrada Carreño Coll hizo lo correcto al limitar la responsabilidad final de Ox Bodies a $1,200,000 equivalente al veinte por ciento (20%) de los daños otorgados por el Jurado". Íd., pág. 1090.

**facilitar el acceso y ampliar la oferta de servicios médicos disponibles a la ciudadanía, y para ello creó los CMAR**. Incluso, mediante esta ley se incorpora como política pública el reconocimiento de la "responsabilidad en la educación profesional de la salud, en especial para la educación médica y estimular el desarrollo de la docencia, la investigación clínica, epidemiológica y sociomédica y servicios en ciencias de la salud". Artículo 2 de la Ley Núm. 136-2006, *supra*.[25] Los CMAR son definidos como un:

> [c]onjunto de uno (1) o más hospitales, facilidades de salud, grupos médicos y programas de formación y entrenamiento de profesionales de la salud relacionadas a una Escuela de Medicina acreditada, cuya misión es la educación, investigación y provisión de servicios de salud". Artículo 3 inciso (b) de la Ley Núm. 136-2006, 24 LPRA sec. 10031(b).

En atención al fin eminentemente público que persigue la creación de los CMAR, el legislador determinó extenderles los límites monetarios dispuestos en la Ley de Reclamaciones y Demandas contra el Estado, Ley Núm. 104, *supra*. Como ya indicamos, mediante la Ley Núm. 103-2011, la Asamblea Legislativa enmendó el Artículo 7 de la Ley Núm. 136-2006, *supra*, y el Artículo 41.050 del Código de Seguros de Puerto Rico para aclarar el alcance de este límite para extenderlo a los CMAR y su facultad docente.

Posteriormente, en la Ley Núm. 94-2023,[26] la Asamblea Legislativa reitera la "crisis real de escasez de médicos" que enfrenta el país y consideró, una vez más, la necesidad de

---

[25] 24 LPRA sec. 10031 nota.
[26] Ley Núm. 94-2023 enmendó el Artículo 7 de la Ley Núm. 136-2006; el inciso (c) del Artículo 21 de la Ley Núm. 139-2008, Ley de la Junta de Licenciamiento y Disciplina Médica; y el Artículo 41.050 del Código de Seguros.

aclarar el alcance del estatuto que creó los CMAR. En su exposición de motivos, el legislador incorporó la interpretación que hemos dado a la inmunidad y a los límites de responsabilidad, y citó:

> … la inmunidad no constituye una defensa personal del médico ante reclamaciones en su contra, sino la inexistencia de causa de acción. Un individuo que disfruta de inmunidad no puede ser objeto de un litigio, independientemente de que haya realizado un acto u omisión negligente. Por otro lado, el límite de responsabilidad se trata de una limitación **impuesta por la Asamblea Legislativa a las cuantías compensables** por actos u omisiones culposos o negligentes. Así, una persona cobijada por inmunidad no puede ser incluida como parte demandada y no le son aplicables los límites de responsabilidad. Esta Asamblea Legislativa entiende que con la aprobación de la presente medida nos permitirá detener el éxodo masivo de la clase médica puertorriqueña, retener los nuevos profesionales de la salud, evitar una crisis de salud pública y garantizar la existencia de suficientes talleres de enseñanza para aumentar los programas de educación médica graduada en Puerto Rico. (Negrilla suplida)

De esta manera, y mediante esta enmienda, quedó claramente establecido en el Artículo 41.050 del Código de Seguros, *supra*, a cuáles instituciones y profesionales de la salud les aplica el límite de responsabilidad. Destacamos que el inciso (vii) mantuvo el **mismo lenguaje** incorporado desde la Ley Núm. 103-2011, a saber, "a los Centros Médicos Académicos Regionales de Puerto Rico, sus estudiantes y miembros de facultad **cuando recaiga sentencia** por actos constitutivos de impericia médica hospitalaria (*malpractice*) **cometida por sus estudiantes y miembros de su facultad** en el desempeño de sus funciones docentes […]". (Negrilla suplida). Además, examinado el Diario de Sesiones de la Ley Núm. 94-2023 (P del S 1197), no encontramos que el legislador hiciera referencia a las aseguradoras ni que estas hubiesen sido parte

del debate legislativo al aprobar esta medida.[27] Diario de Sesiones, 5ta Sesión Ordinaria (27 de junio de 2023 hasta el 30 de junio de 2023), Decimonovena Asamblea Legislativa, Tomo VII.

Examinado el derecho aplicable, procedemos a aplicar el derecho a los hechos.

**III.**

En el presente pleito, el Tribunal de Primera Instancia tenía ante su consideración dos solicitudes de sentencia sumaria parcial y sus respectivas oposiciones. En la primera, el Dr. Soler solicitó la aplicación de la Ley Núm. 136-2006, *supra*. En la segunda, los demandantes peticionaron que se declarase que dicha legislación no es aplicable a SIMED ni a Beazley Group. Dado que las partes recurrieron al mecanismo de la sentencia sumaria para resolver esta controversia, conviene aclarar varios aspectos sobre su uso.

Como es alto conocido, el mecanismo de sentencia sumaria provisto en la Regla 36 de Procedimiento Civil, *supra*, permite a los tribunales **disponer parcial o totalmente de litigios civiles** en aquellos casos en los que no exista una controversia material de hecho que requiera ser dilucidada en un juicio plenario y el Derecho así lo permita.[28] De esta manera, dicho mecanismo se ha descrito como un medio eficaz para los jueces

---

[27] Proyecto del Senado presentado por la señora González Huertas y el señor Soto Rivera (Por Petición). Coautores los señores Ruiz Nieves, Torres Berríos y las señoras González Arroyo, Rosa Vélez y Trujillo Plumey. Referido a la Comisión de Desarrollo Económico, Servicios Esenciales y Asuntos del Consumidor.
[28] Véanse, *León Torres v. Rivera Lebrón*, 204 DPR 20, 41 (2020); *Rodríguez García v. UCA*, 200 DPR 929, 940 (2018).

**descartar reclamaciones** inmeritorias y descongestionar los calendarios judiciales.

En el dictamen aquí recurrido, el Tribunal de Primera Instancia **no dispuso de reclamación alguna** en la intitulada "sentencia parcial", lo allí resuelto **no constituye una adjudicación parcial de la reclamación instada**, ni es elemento de la causa de acción en daños y perjuicios, única reclamación instada por la parte demandante, aquí peticionaria.[29] La "causa petendi" (causa de pedir) en el derecho procesal, consiste en los hechos y fundamentos jurídicos que justifican la acción legal emprendida por una parte en un proceso judicial. *Diccionario de Derecho*, Tomo I, Editorial Boch, 2005, pág. 224. Por lo tanto, la controversia presentada por las partes no era susceptible de ser atendida mediante dicho mecanismo procesal.[30] El dictamen recurrido ante esta Curia constituye a todas luces una mera resolución interlocutoria.[31]

De igual manera, hasta en cierta medida, pudiera considerarse una controversia traída a destiempo por las

_____

[29] Reiteradamente hemos resuelto que, una *resolución* pone fin **a un incidente** dentro del proceso judicial, mientras una sentencia pone fin a la reclamación entre las partes mediante una adjudicación final. Además, en aquellos casos que entrañan **reclamaciones o partes múltiples**, el tribunal puede dictar sentencia parcial sobre una u otra de las reclamaciones sin necesidad a esperar a que esté en condiciones de dictar sentencia sobre todas las reclamaciones. *U.S. Fire Ins. Co. v. A.E.E.*, 151 DPR 962, 967 (2000). Véase *Rodríguez v. Tribl. Mpal. y Ramos*, 74 DPR 656, 664 (1953). Además, "la Regla 43.5 no es de aplicación cuando un tribunal fracciona los elementos básicos de negligencia y daños. Esto en vista de que, **al disponer del primer aspecto, la negligencia, no se resuelve finalmente la cuestión litigiosa** de la cual pueda apelarse. Dicho dictamen es de carácter interlocutorio. La sentencia no puede ser final por no ser aún ejecutable". *Díaz v. Navieras de P.R.*, 118 DPR 297, 301 (1987). Véase *U.S. Fire Ins. Co. v. A.E.E.*, *supra*, pág. 968.
[30] En general, la dificultad mayor que en esta etapa del procedimiento plantea la resolución recurrida estriba, no solo en el uso incorrecto del mecanismo de sentencia sumaria, sino en que el remedio declaratorio solicitado tampoco satisfice el mecanismo de la sentencia declaratoria.
[31] Véanse, las Regla 43.1 y 43.5 de las Reglas de Procedimiento Civil, *supra*; *Rodríguez v. Tribl. Mpal. y Ramos*, *supra*, pág. 664; *Díaz v. Navieras de P.R.*, *supra*, *págs. 301-302*; *U.S. Fire Ins. Co. v. A.E.E*, supra.

partes. **La responsabilidad de las aseguradoras, si alguna, de indemnizar, nace una vez se determine que sus asegurados son responsables de los daños reclamados.** El grado de responsabilidad por el cual, en su día, podrían responder los codemandados-asegurados, no figura en nuestro ordenamiento como uno de los tres elementos constitutivos de una causa de acción de daños y perjuicios. Más aún, no constituye un elemento esencial al momento en que el juzgador fija el valor de la compensación. Adviértase que, una vez determinado por el tribunal el valor de los daños es entonces que corresponde aplicar los límites de responsabilidad que nuestra legislación ha reconocido en varias disposiciones como la Ley Núm. 104, *supra*, y la Ley Núm. 136-2006, *supra*. Nótese que el Artículo 41.050 del Código de Seguros, *supra*, es claro al indicar que los límites de responsabilidad que la Ley Núm. 104, *supra*, impone, aplicará a los CMAR, sus estudiantes y miembros de facultad, **cuando recaiga sentencia.**

Ante este escenario procesal, ello sería de por sí suficiente para disponer del presente recurso. No obstante, los argumentos que han esbozado las aseguradoras, amparadas en el contrato de seguro, ameritan nuestra intervención, dado el alto grado de interés público que envuelve el negocio de seguros y su vital importancia en nuestro país.

Como es conocido, al analizar e interpretar la ley los tribunales debemos considerar cuáles fueron los **propósitos** perseguidos por la Asamblea Legislativa al aprobarla y el fin social que los inspiró. Ello, con el fin, de atribuirle un sentido lógico que asegure el resultado que originalmente se

quiso obtener y suplir posibles deficiencias, solo cuando sea necesario.

La Ley Núm. 136-2006, *supra*, creó los CMAR con el fin de fortalecer y desarrollar los programas de educación para profesionales de la salud, así como la investigación clínica, epidemiológica y sociomédica en Puerto Rico.[32] **A estos centros, y a los miembros de su facultad**, se les extendió el límite de responsabilidad establecido en la Ley Núm. 104, *supra*, por los procedimientos médicos que se lleven a cabo en el ejercicio de sus funciones académicas y docentes.[33] Ahora bien, de la legislación antes consignada, no surge que las aseguradoras hayan sido consideradas por la Asamblea Legislativa al aprobar estas leyes.

En consecuencia, no es posible concluir que el límite de responsabilidad también les sea aplicable a las aseguradoras, ya que, **de haber sido esa la intención legislativa, así se habría dispuesto**.[34] Las leyes aquí examinadas no fueron aprobadas con el fin de reducir las primas de los seguros a la clase médica ni a las instituciones de salud.[35] Su propósito está claramente definido en sus respectivas exposiciones de motivos. El texto de las leyes es claro y no encontramos

---

[32] Véase Exposición de Motivos de la Ley Núm. 136-2006.

[33] Posteriormente, este articulado fue enmendado por la Ley Núm. 94-2023 mediante la cual el legislador determinó la aplicabilidad de los límites de responsabilidad con mayor especificidad.

[34] Distinto a nuestra legislación, la legislación promulgada en el estado de Luisiana, conocida como *Medical Malpractice Act*, tuvo como propósito regular la indemnización total por daños y perjuicios de las víctimas al establecer límites de responsabilidad, y **así reducir las primas de seguro**. Por ello, la Corte Suprema de dicho estado ha permitido que las aseguradoras invoquen como defensa los límites de responsabilidad concedidos a sus asegurados. *Descant v. Administrators of Tulane Educational Fund*, 639 So. 2d 246 (1994).

[35] En el presente caso ni tan siguiera las aseguradoras argumentaron que la aplicación de los límites de responsabilidad **conllevaría un ajuste en la prima**.

fundamento alguno que permita lógicamente ultimar lo contrario.

En el presente caso, tanto el Tribunal de Primera Instancia como el Tribunal de Apelaciones resolvieron correctamente que los estatutos invocados, no extienden de manera expresa los límites de responsabilidad a las aseguradoras. Como es conocido, aun cuando tenemos la facultad para interpretar las leyes, su lenguaje claro y explícito no debe ser tergiversado, malinterpretado ni sustituido.[36] Por lo cual, los argumentos esbozados por las aseguradoras no pueden ser avalados por este foro, pues no podemos usurpar la función de legislar, la cual corresponde exclusivamente al Poder Legislativo.

Por otra parte, la interpretación que las aseguradoras pretenden dar a las cláusulas de acuerdo de cubierta (*coverage agreements*), y que a su vez fue acogida por el Tribunal de Apelaciones, es contraria al derecho de seguros. De hecho, evaden su responsabilidad claramente establecida en la póliza al ofrecer una interpretación incorrecta de una cláusula cuyo lenguaje es común en todo contrato de seguros.

En el caso de autos, el Tribunal de Primera Instancia concluyó que en las cláusulas, a las que hicieron referencia las aseguradoras, éstas simplemente **se obligaron al pago de todas las cantidades que en su día el asegurado pueda estar legalmente obligado a pagar como daños** ("*[a]ll sums which the*

---

[36] Véase *PR Fast Ferries, et al. v. AAPP*, 213 DPR 103 (2023), y casos allí citados.

*Insured shall become legally obligated to pay as damages …*").[37] No obstante, dicho foro reiteró "que tal disposición contractual no es contraria a nuestra determinación de que los límites dispuestos en la Ley 136-2006, *supra*, no son oponibles a las aseguradoras, SIMED y Beazley Group".[38] Sin embargo, el Tribunal de Apelaciones "revocó" dicho dictamen bajo el errado fundamento de que dicha cláusula es una **exclusión de la póliza**, y que los asegurados, es decir, el Dr. Soler y el Hospital San Lucas, **acordaron con las aseguradoras que solo pagarán hasta el límite de responsabilidad dispuesto en la Ley Núm. 136-2006, *supra*.** Incluso, en una contradicción, el foro apelativo advirtió que, como norma general, las aseguradoras responden hasta el monto de sus pólizas.

No existe fundamento en derecho, ni en el expediente, que permita concluir que **los asegurados acordaron con las aseguradoras** el que estas respondan hasta las cantidades dispuestas en la Ley Núm. 104, *supra*, a saber: $75,000 por accidente y $150,000 por los daños y perjuicios causados a más de una persona, o cuando existieran varias causas de acción a favor de un solo perjudicado, como **condición expresa** articulada en las pólizas expedidas a favor del Dr. Soler y el Hospital San Lucas.

---

[37] Véase apéndice del recurso, pág. 828. La cláusula en la póliza de Beazley Group dispone que esta se obligó a pagar el monto de la suma neta final que el asegurado advenga legalmente obligado a pagar por daños y perjuicios ("… will indemnify the INSURED for that amount of the ULTIMATE NET SUM PAYABLE which the INSURED **shall be legally obligated to pay** as damages"). (Negrilla suplida).
[38] Íd. Subrayado en el original.

De un examen del expediente surge que la póliza emitida por **SIMED tiene un límite de $100,000 por individuo y $300,000 por agregados, mientras que la póliza de Beazley Group establece una cubierta de $1,500,000 por incidente y hasta $6,000,000 por responsabilidad profesional, respectivamente.**[39] Reiteramos que de los contratos de seguro no surge que dichos límites de responsabilidad estén sujetos a alguna condición.[40]

Conforme al derecho antes expuesto, las exclusiones —distinto a las condiciones— **limitan o excluyen el alcance de las cubiertas,** específicamente excluyendo aquellos riesgos o peligros de la cubierta general que el asegurador así exprese en esta parte de la póliza. Por ende, las cláusulas examinadas por el foro intermedio no son cláusulas de exclusión.

Además, al concluir que dichas cláusulas limitaban la póliza a los límites establecidos en la Ley Núm. 136-2006, *supra*, como parte de un acuerdo entre las partes, el foro intermedio **pasó por alto que, en nuestra jurisdicción, el contrato de seguros es un contrato de adhesión, cuyas cláusulas no solo son unilateralmente redactadas por las aseguradoras, sino que deben ser aprobadas por el Comisionado de Seguros.** El Código de Seguros claramente dispone que:

> [l]a responsabilidad del asegurador **no excederá de aquella dispuesta en la póliza,** y el tribunal deberá determinar no solamente la responsabilidad del asegurador, sino que también la cuantía de la pérdida. Artículo 20.030 del Código de Seguros, 26 LPRA sec. 2003.

---

[39] Véase apéndice del recurso, págs. 552 y 570.
[40] Como indicamos, los derechos y obligaciones, tanto del asegurador como del asegurado en una póliza de seguro, quedan establecidos en la parte referente a las condiciones. En esta parte, el asegurador condiciona su obligación indemnizatoria y también expresa cuáles son sus derechos y los del asegurado.

Como adelantamos, hablar de cuantías en el presente caso es puramente especulativo, ya que aun el foro de primera instancia no ha celebrado el juicio en su fondo.[41]

Por lo anterior, erró el Tribunal de Apelaciones al concluir que las cláusulas en controversia establecen un tope distinto al acordado en la póliza, y al catalogarlas como cláusulas de exclusión. Además, las aseguradoras simplemente pretenden darles a estas cláusulas un sentido distinto al que siempre han tenido.

La interpretación que sobre las cláusulas intentaron establecer las aseguradoras, no solo es contrario a la propia póliza, sino que su redacción, como señaláramos en el derecho antes consignado, es la típica de estos modelos. La póliza expedida por SIMED dispone: "all sums which the Insured shall become **legally obligated to pay** as damages". De igual manera, la póliza de Beazley Group expresa: "… will indemnify the INSURED for that amount of the ULTIMATE NET SUM PAYABLE which the INSURED shall be **legally obligated to pay** as damages".

En consecuencia, interpretadas globalmente ambas pólizas, no hay obstáculo alguno para favorecer una interpretación que haga efectiva la cubierta según fueron pactadas. Reiteramos que estas cláusulas han sido interpretadas desde el aspecto de responsabilidad extracontractual y no en referencia a cantidad alguna. En suma, **la cláusula aquí en controversia sirve para expresar el requisito de responsabilidad legal necesario para que la**

---

[41] Nótese que el pago o indemnización es **por el valor real de los daños**, los cuales pudieran ser por debajo del máximo pactado en la póliza o incluso superior.

**aseguradora responda según los contornos de su póliza**. Couch, *op. cit.*, Vol. 7A, sec. 103:14.

Por otro lado, no conocemos de ninguna ocasión en que la cláusula haya sido interpretada para referirse a cantidades y límites específicos por el cual una aseguradora deba responder que no sean aquellos pactados en la póliza. Además, es importante recordar que en nuestra jurisdicción los modelos o formularios de póliza requieren la aprobación del Comisionado de Seguros, quien tiene la facultad de desaprobar cualquier cláusula inconsistente, ambigua o con condiciones que afecten de forma engañosa el riesgo que se pretende cubrir en la póliza.[42]

Por último, señalamos una vez más que no existe hecho alguno que sustente la interpretación que han pretendido las aseguradoras en el presente caso. La Asamblea Legislativa es a quien le corresponde hacer la determinación sobre la extensión a las aseguradoras de los límites de responsabilidad dispuestos en la Ley Núm. 104, *supra*, y la Ley Núm. 136-2006, *supra*.

En conclusión, el error señalado fue cometido, por lo que procede modificar la *Sentencia* dictada por el Tribunal de Apelaciones y confirmar el dictamen emitido por el Tribunal de Primera Instancia. El presente caso debe devolverse para que se celebre el juicio en su fondo a la mayor brevedad posible. El principio rector que permea todo nuestro

---

[42] Véase, además, Appleman, *Insurance Law and Practice*, Vol. 12, sec. 7005, ed. 1981, págs. 56-57.

ordenamiento procesal es la solución de controversias de una manera justa, rápida y económica.

**IV.**

Por los fundamentos antes expuestos, modificamos el dictamen recurrido en cuanto a que las cláusulas contenidas en las pólizas, aquí en controversia, no son cláusulas de exclusión ni constituyen un acuerdo entre el asegurado y la aseguradora para responder por debajo de los límites dispuestos en el contrato de seguro, y se confirma en los demás asuntos. En consecuencia, restablecemos el dictamen emitido por el Tribunal de Primera Instancia.

Se dictará Sentencia en conformidad.

Camille Rivera Pérez
Jueza Asociada

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | | |
|---|---|---|
| Luis Samuel Negrón Castro y otros<br><br>Peticionarios<br><br>v.<br><br>Hiram M. Soler Bernardini, su esposa Marisol Portilla Delgado y la Sociedad Legal de Bienes Gananciales compuesta por ambos; Hospital Episcopal San Lucas Ponce; Bernardo Campos González, Hospital Español Auxilio Mutuo de Puerto Rico, Inc.; Beazly Group; The Medical Protective Company; SIMED; Puerto Rico Medical Defense Insurance; John Doe, Richard Roe<br><br>Recurridos | CC-2024-0466 | *Certiorari* |

**SENTENCIA**

En San Juan, Puerto Rico, a 6 de octubre de 2025.

Por los fundamentos expuestos en la *Opinión* que antecede, la cual se hace formar parte de la presente *Sentencia*, **modificamos el dictamen recurrido en cuanto a que las cláusulas contenidas en las pólizas**, aquí en controversia, no son cláusulas de exclusión ni constituyen un acuerdo entre el asegurado y la aseguradora para responder por debajo de los límites dispuestos en el contrato de seguro, y **se confirma en los demás asuntos**. En consecuencia, **restablecemos el dictamen emitido por el Tribunal de Primera Instancia**.

Lo acordó el Tribunal y certifica el Secretario del Tribunal Supremo. El Juez Asociado señor Colón Pérez emite *Opinión Concurrente.*

Javier O. Sepúlveda Rodríguez
Secretario del Tribunal Supremo

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Luis Samuel Negrón Castro,
y otros

     Peticionarios

         v.

Hiram M. Soler Bernardini,
y otros

     Recurridos

CC-2024-0466    *Certiorari*

Opinión concurrente emitida por el Juez Asociado señor COLÓN PÉREZ.

En San Juan, Puerto Rico a 6 de octubre de 2025.

¿Son los límites de responsabilidad establecidos en la Ley de Reclamaciones y Demandas contra el Estado, *infra*, y, por consiguiente, en la Ley de Centros Médicos Académicos Regionales, *infra*, extensivos a las compañías aseguradoras de las instituciones de salud, o de los profesionales de la medicina que, de forma directa, se benefician de éstos? Realizado el estudio de rigor, -- y por fundamentos, en parte, distintos a los adoptados por una mayoría de este Tribunal --, desde la concurrencia contestamos dicha interrogante en la negativa. Veamos por qué.

I.

Los hechos que dan margen al presente litigio no están en controversia. Por alegados actos constitutivos de impericia médica, el Sr. Luis S. Negrón Castro (en adelante, "señor Negrón Castro"),su esposa, la Sra. Sonia E. Lugo Ramos, la Sociedad Legal de Bienes Gananciales compuesta por ambos, y sus hijos menores de edad, N.A., V.S. y A.S. (en adelante y en conjunto, "señora Lugo Ramos"), presentaron ante el Tribunal de Primera Instancia una *Demanda* en daños y perjuicios en contra del Dr. Hiram M. Soler Bernardini, su esposa y la Sociedad Legal de Bienes Gananciales compuesta por ambos (en adelante y en conjunto, "doctor Soler Bernardini"); el Hospital Episcopal San Lucas de Ponce (en adelante, "Hospital San Lucas"); el Dr. Bernardo Campos González (en adelante, "doctor Campos González"); el Hospital Español Auxilio Mutuo de Puerto Rico, Inc. (en adelante, "Hospital Auxilio Mutuo"); y sus respectivas compañías aseguradoras, Beazley Group[1] (en adelante, "Beazley"); The Medical Protective Company (en adelante, "Medical Protective");[2] SIMED;[3] y Puerto Rico Medical Defense Insurance[4].[5]

---

[1] Compañía aseguradora del Hospital San Lucas.

[2] Compañía aseguradora del Hospital Auxilio Mutuo.

[3] Compañía aseguradora del doctor Soler Bernardini.

[4] Compañía aseguradora del doctor Campos González.

[5] A grandes rasgos, en el referido documento se alegó que, luego de que el señor Negrón Castro comenzara a sentir molestias abdominales, el doctor Soler Bernardini le removió la vesícula en el Hospital San Lucas. Los demandantes atribuyeron a dicho procedimiento las posteriores complicaciones de salud que sufrió el señor Negrón Castro, las cuales requirieron de una segunda intervención quirúrgica llevada a cabo, en esa ocasión, por el doctor Campos González en el Hospital Auxilio Mutuo.

Enterados de lo anterior, oportunamente, y por separado, el doctor Soler Bernardini, el Hospital San Lucas y el Hospital Auxilio Mutuo presentaron sus contestaciones a la demanda.[6] En síntesis, el referido galeno y las mencionadas instituciones hospitalarias negaron incurrir en negligencia al brindar tratamiento médico y hospitalario al señor Negrón Castro. En la alternativa, y de entender el foro primario que éstos eran responsables, adujeron que le eran de aplicación los límites de responsabilidad establecidos en la Ley Núm. 136-2006, también conocida como la *Ley de los Centros Médicos Académicos Regionales de Puerto Rico*, 24 LPRA sec. 10031 *et seq.* (en adelante, "*Ley de los Centros Médicos Académicos Regionales*").

Por su parte, y también por separado, las compañías aseguradoras, SIMED, Beazley y Medical Protective, contestaron la *Demanda* instada en su contra por la señora Lugo Ramos, y alegaron que, entre otras cosas, de en su día, determinarse que sus asegurados eran responsables por impericia médica u hospitalaria, éstas responderían conforme a las condiciones y términos de sus respectivos contratos de seguros.

Más adelante en el litigio, y, en parte, en lo pertinente a la controversia que nos ocupa, el doctor Soler Bernardini presentó ante el Tribunal de Primera Instancia una *Moción*

---

Cabe destacar que, el 5 de julio de 2021, mientras se tramitaba la causa de epígrafe, el señor Negrón Castro falleció. A tales efectos, la señora Lugo Ramos presentó ante el Tribunal de Primera Instancia una *Demanda enmendada*.

[6] Toda vez que el doctor Campos González había radicado una petición de quiebras ante el Tribunal federal, el foro primario ordenó paralizar los procedimientos contra éste.

*solicitando sentencia sumaria parcial*, en la cual argumentó que el foro primario debía establecer que a éste le eran de aplicación los límites de responsabilidad establecidos en la *Ley de los Centros Médicos Académicos Regionales*, *supra*.[7] Dicha solicitud fue denegada por el Tribunal de Primera Instancia.

Así las cosas, meses más tarde, el doctor Soler Bernardini replicó dicho pedido al foro primario mediante una *Segunda moción solicitando se dicte[ase] sentencia parcial sobre los límites aplicables al caso […]*. En particular, en el referido documento, el galeno en cuestión arguyó que, durante el tratamiento médico brindado al señor Negrón Castro en el Hospital San Lucas, intervinieron estudiantes y médicos en entrenamiento de la residencia en cirugía, por lo que, del Tribunal de Primera Instancia determinar algún tipo de responsabilidad monetaria atribuible a éste, le serían de aplicación las cuantías máximas establecidas en la Ley Núm. 104 de 29 de junio de 1955, también conocida como la *Ley de reclamaciones y demandas contra el Estado*, 32 LPRA sec. 3077 *et seq.* (en adelante, "*Ley de pleitos contra el Estado*"), y, por consiguiente, en la *Ley de los Centros Médicos Académicos Regionales*, *supra*. A dicha solicitud, se unieron el Hospital San Lucas y Beazley.

De otra parte, y luego de varios incidentes procesales no necesarios aquí pormenorizar, la señora Lugo Ramos también presentó ante el foro primario una *Moción solicitando*

_____

[7] SIMED se unió a dicha moción y solicitó que se le hicieran extensivos los argumentos planteados por su asegurado.

*sentencia sumaria parcial.* En ésta, la señora Lugo Ramos solicitó al Tribunal de Primera Instancia que, mediante sentencia, resolviese que SIMED y Beazley, -- por ser éstas compañías aseguradoras --, no podían beneficiarse de los límites de responsabilidad dispuestos en la *Ley de Pleitos contra el Estado*, *supra*, y, por consiguiente, en *la Ley de los Centros Médicos Académicos Regionales*, *supra*.

En respuesta a la moción de sentencia sumaria parcial presentada por la señora Lugo Ramos, SIMED presentó, ante el foro primario, una *Moción […] en oposición a solicitud de sentencia sumaria parcial de la parte demandante*, en la cual argumentó que las compañías aseguradoras solo están expuestas a responder hasta el grado de responsabilidad de sus asegurados. A juicio de SIMED, los límites de responsabilidad, -- como los establecidos en la *Ley de Pleitos contra el Estado*, *supra*, y, por consiguiente, en la *Ley de los Centros Médicos Académicos Regionales*, *supra* --, no son una defensa personal de los asegurados; más bien, son una limitación al grado de responsabilidad de estos últimos, lo cual, a su vez, es determinante a los fines de delimitar la obligación que pueda imponérsele a sus aseguradoras. Oportunamente, en un escrito separado, el Hospital San Lucas y su aseguradora, Beazley, se unieron en lo explicado ante el Tribunal de Primera Instancia por SIMED, y aprovecharon la oportunidad para incluir en su comparecencia ante el foro primario copia del contrato de seguro firmado por ambas entidades.

En lo que respecta al contrato de seguro que el Hospital San Lucas y su compañía aseguradora, Beazley, unieron al escrito presentado ante el Tribunal de Primera Instancia, éstos expresaron que, -- y en lo relacionado a controversias como las que hoy nos ocupan --, el mismo contenía una cláusula que limitaba la responsabilidad de la aseguradora hasta aquella que fuese responsable el asegurado. En particular, la referida cláusula contractual establecía lo siguiente:

*INSURING AGREEMENTS*

***1. COVERAGE: Medical Professional Liability***

*In the event that a claim or claims are first made, in writing, against the INSURED during the period of the Policy, and notified in accordance with the Reporting and Claims Handling Condition of this Policy, and provided such claim or claims arise the Retroactive Date set forth in Item 6 of the Declarations,* ***Underwriters will indemnify the INSURED for that amount of the ULTIMATE NET SUM PAYABLE which the INSURED shall be legally obligated to pay as damages*** *[…].* (Énfasis suplido). Apéndice del *Certiorari*, pág. 593.

Conforme a lo dispuesto en la precitada cláusula, el Hospital San Lucas, y su compañía aseguradora, Beazley, argumentaron ante el foro primario que los límites de responsabilidad establecidos en la *Ley de Pleitos con el Estado*, *supra*, y, por consiguiente, en la *Ley de los Centros Médicos Académicos Regionales*, *supra*, le aplicaban a esta última de forma indirecta, al estar obligada a responder hasta el grado de responsabilidad que tuviera que resarcir el Hospital San Lucas.[8]

---

[8] Cabe destacar que SIMED y el doctor Soler Bernardini habían suscrito una póliza de seguros que contenía una cláusula similar a la convenida entre

Evaluadas las solicitudes de sentencia sumaria parcial ante su consideración, así como las respectivas oposiciones, el Tribunal de Primera Instancia emitió una *Sentencia parcial*, mediante la cual determinó, en primer lugar, que los límites de responsabilidad aquí invocados, -- entiéndase, los establecidos en la *Ley de Pleitos contra el Estado*, *supra*, y, por consiguiente, en la *Ley de los Centros Médicos Académicos Regionales*, *supra* --, le eran solo de aplicación al doctor Soler Bernardini y al Hospital San Lucas. Lo anterior, pues se había demostrado que: (1) el doctor Soler Bernardini era el "Instructor" de los estudiantes de residencia en cirugía que intervinieron en el tratamiento del señor Negrón Castro en el Hospital San Lucas, y (2) que la mencionada institución hospitalaria era un Centro Médico Académico Regional, de conformidad con lo establecido en la *Ley de los Centros Médicos Académicos Regionales*, *supra*.

En segundo lugar, el foro primario entendió que a las compañías aseguradoras de los profesionales de la medicina a los que hemos hecho referencia no les eran extensivos los límites de responsabilidad invocados por éstas, toda vez que

---

el Hospital San Lucas y Beazley. Es decir, una cláusula que establecía que SIMED solo sería responsable hasta la cantidad que el doctor Soler Bernardini estuviera obligado a pagar en daños por impericia médica. En específico, la referida cláusula leía de la siguiente forma:

> *I. Coverage Agreements*
>
> **The Syndicate will pay on behalf of the Insured** *with respect only to his practice within the Commonwealth of Puerto Rico:*
>
> *Coverage A- Individual Professional Liability*
>
> **All Sums which the Insured shall become legally obligated to pay as damages because of injury to which this policy applies caused by medical incident** […] (Énfasis suplido). Apéndice del *Certiorari*, pág. 554.

**dichos límites solo protegen a los y las estudiantes de medicina y miembros de la facultad médica docente que trabajen en un Centro Médico Académico Regional, más no a médicos u otro personal de un hospital que no fuese parte del programa académico.** Sobre este extremo, el Tribunal de Primera Instancia concluyó que la *Ley de los Centros Médicos Académicos Regionales*, *supra*, establece una protección personalísima para los doctores docentes laborando en estos centros.

Inconforme con lo sentenciado por el foro primario, mediante *Moción bajo las Reglas 43.1 y 47 de Procedimiento Civil,* SIMED solicitó al Tribunal de Primera Instancia que enmendase y reconsiderase el dictamen emitido en la causa de epígrafe. A este pedido, se unió el Hospital San Lucas y Beazley.

Empero, a pesar de que enmendó las determinaciones de hechos para acoger un hecho incontrovertido adicional, el foro primario se sostuvo en su determinación respecto a la inaplicabilidad de los límites de responsabilidad establecidos en la *Ley de Pleitos contra el Estado*, *supra*, y, por consiguiente, en la *Ley de los Centros Médicos Académicos Regionales*, *supra*, a las compañías aseguradoras aquí demandadas.

En desacuerdo todavía, el Hospital San Lucas y, su compañía aseguradora, Beazley, presentaron ante el Tribunal de Apelaciones un recurso de *Apelación*.[9] En el mismo, y en esencia, señalaron que el foro primario había errado al

---

[9] Dicho recurso fue identificado como KLAN202300984.

resolver que los límites de responsabilidad establecidos en la *Ley de Pleitos contra el Estado*, *supra*, y, por consiguiente, en la *Ley de los Centros Médicos Académicos Regionales*, *supra*, no son extensivos a las compañías aseguradoras de los profesionales de la medicina que de forma directa se benefician de ellos. Asimismo, alegaron que el Tribunal de Primera Instancia había errado al ignorar las cláusulas contractuales contenidas en la póliza de seguro acordada entre estas entidades, que limitaban su responsabilidad hasta aquella que fuese responsable el asegurado. Con fundamentos similares, SIMED también presentó ante el foro apelativo intermedio un *Escrito de Apelación*.[10]

**Consolidados ambos recursos, y evaluados los alegatos de las partes, el Tribunal de Apelaciones dictó *Sentencia*, mediante la cual revocó la *Sentencia parcial* emitida por el foro primario. En síntesis, el foro apelativo intermedio razonó que, si bien los límites de responsabilidad aquí levantados, -- entiéndase, los establecidos en la *Ley de Pleitos contra el Estado*, *supra*, y, por consiguiente, los dispuestos en la *Ley de los Centros Médicos Académicos Regionales*, *supra* --, son solo de aplicación a los Centros Médicos Académicos Regionales y a los profesionales de salud que laborasen en dichos centros, en el presente caso existían ciertas cláusulas contractuales entre las partes que llegaban a igual resultado en cuanto a SIMED y Beazley, entiéndase que**

---

[10] Se le asignó la referencia KLAN202300987.

**las compañías aseguradoras responderían solo por las cantidades que sus asegurados estuviesen llamados a resarcir.**

Insatisfecha con el dictamen emitido por el Tribunal de Apelaciones, la señora Lugo Ramos acudió ante este Tribunal mediante una petición de *Certiorari*. En la misma, ésta señala que el foro apelativo intermedio erró al resolver que, en el presente caso, las compañías aseguradoras de las instituciones hospitalarias, y de los profesionales de la salud aquí demandados, solo responderían por aquellas cantidades, si alguna, que sus aseguradoras fuesen responsables ante los demandantes, según fue pactado en determinadas pólizas de seguro otorgadas entre éstas y éstos. A juicio de la señora Lugo Ramos, lo resuelto por el Tribunal de Apelaciones choca con los principios de superior jerarquía dispuestos en los Art. 20.030 y 20.050 de la Ley Núm. 77 de 19 de junio de 1957, también conocida como el *Código de Seguros de Puerto Rico*, 26 LPRA secs. 2003 y 2004 (en adelante, "Código de Seguros"), por lo que solicita que tal determinación sea revocada.

A dicha solicitud, y bajo argumentos similares a los expuestos en el foro primario y apelativo intermedio, SIMED, Beazley y el Hospital San Lucas se opusieron. En síntesis, éstos argumentan que los contratos de seguros aquí otorgados entre las compañías aseguradoras y sus asegurados establecían que, en casos como estos, las aseguradoras serían responsables hasta la cantidad, si alguna, que su asegurado estuviese obligado a pagar.

Trabada así la controversia, y con el beneficio de la comparecencia de ambas partes, una mayoría de mis compañeras y compañeros de estrado determinan que los límites de responsabilidad dispuestos en la *Ley de los Centros Médicos Académicos Regionales*, *supra*, no son extensivos a las aseguradoras. Asimismo, concluyen que la cláusula contractual en cuestión no constituye una cláusula de exclusión. Con este dictamen, como mencionamos, concurrimos.

II.

A.

Como es sabido, en Puerto Rico, el Estado goza de aquello que se conoce como inmunidad soberana. *ELA v. El Ojo de Agua Development*, Inc., 205 DPR 502, 515 (2020); *Defendini Collazo v. ELA*, 134 DPR 28, 47 (1993); *Porto Rico v. Rosaly*, 227 US 270, 273 (1913). En esencia, ello se refiere a que este último no puede ser demandado si no presta su consentimiento. *Casillas Carrasquillo v. ELA*, 209 DPR 240, 247 (2022); *ELA v. El Ojo de Agua Development, Inc.*, *supra*; *Defendini Collazo v. ELA*, *supra*.

Sobre este aspecto, es menester señalar que, allá para el año 1955, con la aprobación de la *Ley de Pleitos contra el Estado*, *supra*, nuestra Asamblea Legislativa decidió ceder, de manera parcial, y en determinados escenarios, la inmunidad soberana que éste ostenta. *Casillas Carrasquillo v. ELA*, *supra*, pág. 248; *ELA v. El Ojo de Agua Development, Inc.*, *supra* pág. 516; *Berríos Román v. ELA*, 171 DPR 549, 556 (2007). **Particularmente, y en lo pertinente a la causa de epígrafe, en**

**virtud del precitado estatuto, el Estado consintió a ser demandado en daños y perjuicios por actuaciones y omisiones culposas o negligentes de sus funcionarios, empleados o agentes, en el desempeño de sus funciones.** Art. 2(a), *Ley de Pleitos contra el Estado*, 32 LPRA sec. 3077; *Casillas Carrasquillo v. ELA*, *supra*; *Defendini Collazo v. ELA*, *supra*, pág. 49; *Berríos Román v. ELA*, *supra*.

Ahora bien, siendo este consentimiento una excepción a la inmunidad gubernamental de la cual goza el Estado, la Asamblea Legislativa lo acompañó de una serie "de limitaciones y salvaguardas procesales que rigen la forma en que un perjudicado podrá reclamar indemnización del soberano." *Berríos Román v. ELA*, *supra*. Una de estas limitaciones y salvaguardas procesales lo fue el establecer unos topes de responsabilidad de los cuales el Estado se beneficiará cuando advenga en su contra una sentencia por daños y perjuicios.

En esa dirección, el Art. 2(a) de la *Ley de Pleitos contra el Estado*, *infra*, el cual regula los límites de responsabilidad del Estado, dispone lo siguiente:

(a) **Acciones por daños y perjuicios a la persona o a la propiedad hasta la suma de setenta y cinco mil (75,000.00) dólares causados por acción u omisión de cualquier funcionario, agente o empleado del Estado, o cualquier otra persona actuando en capacidad oficial y dentro del marco de su función, cargo o empleo interviniendo culpa o negligencia; o acciones por daños y perjuicios por alegados actos de impericia médico hospitalaria a los profesionales de la salud que laboren en las áreas de obstetricia, ortopedia, cirugía general o trauma exclusivamente en instituciones de salud pública propiedad del Estado Libre Asociado de Puerto Rico, sus dependencias, instrumentalidades y/o municipios,** independientemente de si dichas

instituciones están administradas u operadas por una entidad privada; **[c]uando por tal acción u omisión se causaran daños y perjuicios a más de una persona, o cuando sean varias las causas de acción a que tenga derecho un solo perjudicado, la indemnización por todos los daños y perjuicios que causare dicha acción u omisión no podrá exceder de la suma de ciento cincuenta mil (150,000.00) dólares.** (Énfasis suplido). 32 LPRA sec. 3077.

Como se puede apreciar, de la precitada disposición legal claramente se desprende que son contadas las instancias en las que el Estado será responsable en daños y perjuicios. Y cuando lo sea, solo será responsable hasta la suma de $75,000.00, o hasta la cantidad de $150,000.00 de existir varias causas de acción o varios perjudicados.

**Sobre esto último, cabe señalar que este Tribunal ha caracterizado tales límites estatutarios como una defensa personal del Estado y sus municipalidades, por lo que solo pueden ser aplicados a la porción de la deuda por la cual estas partes sean responsables.** *Véase*, *Quílez-Velar et al. v. Ox Bodies, Inc.*, 198 DPR 1079, 1089 (2017). **Puesto de otra forma, los límites de responsabilidad de la *Ley de Pleitos contra el Estado*, *supra*, como regla general, solo le son aplicables al beneficiario personal, -- a saber, el Estado --, y no a terceras partes.**

B.

Ahora bien, dicho ello, es menester señalar que, a modo de excepción, nuestra Asamblea Legislativa, dentro de sus prerrogativas constitucionales y en aras de fortalecer un interés público en particular, ha decidido extender tales límites establecidos en la *Ley de Pleitos contra el Estado*,

*supra*, a ciertos entes privados que desempeñan determinadas funciones públicas.[11] En esa dirección, mediante la *Ley de los Centros Médicos Académicos Regionales*, *supra*, los límites de responsabilidad antes mencionados fueron extendidos a los Centros Médicos Académicos Regionales y a su personal médico-docente.

En particular, el precitado estatuto define a los Centros Médicos Académicos Regionales como un "[c]onjunto de uno o más hospitales, facilidades de salud, grupos médicos y programas de formación y entrenamiento de profesionales de la salud relacionados a una Escuela de Medicina acreditada, cuya misión es la educación, investigación y provisión de servicios de salud." Art. 3, *Ley de los Centros Médicos Académicos Regionales*, 24 LPRA sec. 10031(b). Estos centros, conforme a lo dispuesto en ley, funcionan como entidades independientes sin fines de lucro, separados de cualquier otra agencia o instrumentalidad del Gobierno del Estado Libre Asociado de Puerto Rico; no obstante, en lo relacionado a sus servicios de salud, trabajan en coordinación con el Departamento de Salud de Puerto Rico. Art. 4, *Ley de los Centros Médicos Académicos Regionales*, 24 LPRA sec. 10032. Asimismo, los Centros Médicos Académicos Regionales tienen personalidad jurídica propia y separada de todo funcionario del Gobierno de Puerto Rico y sus agencias, instrumentalidades, corporaciones públicas y

---

[11] A modo de ejemplo, la Ley Núm. 53 de 26 de mayo de 2020 extendió a los profesionales de la salud, que laboraran en instituciones privadas, los límites de responsabilidad de la *Ley de Pleitos contra el Estado*, *supra*, en casos de daños y perjuicios por actos de impericia médico-hospitalaria durante la pandemia del COVID-19.

subdivisiones. *Íd.* En fin, estos centros son entidades privadas creadas por la Asamblea Legislativa para asistir al Estado en sus funciones públicas.

**En cuanto a los límites de responsabilidad aplicables a los Centros Médicos Académicos Regionales, el Art. 7 de su ley habilitadora establece que serán los mismos que cobijan al Estado.** Específicamente, y al momento de los hechos aquí en controversia, el mencionado artículo rezaba de la siguiente manera:

> **Se extenderán las limitaciones impuestas en la [*Ley de pleitos contra el Estado*, *supra*] a los Centros Médicos Académicos Regionales, estudiantes, médicos en adiestramiento postgraduado y miembros de facultad de los mismos, por los procedimientos médicos que se lleven a cabo en dichos Centros en el ejercicio de sus funciones docentes. Dicha limitación establece un máximo de $75,000 por los daños sufridos por una persona y hasta $150,000 cuando los daños y perjuicios se le causaron a más de una persona, o cuando sean varias las causas de acción a que tenga derecho un solo perjudicado.** Además, se extenderá al consorcio lo estipulado en el quinto párrafo del Artículo 41.050 del Código de Seguros de Puerto Rico. (Énfasis suplido). 24 LPRA sec. 10035.

Dicho ello, para entender por qué los miembros de la Asamblea Legislativa, -- de manera excepcional --, decidieron extender los límites estatutarios de la *Ley de Pleitos contra el Estado*, *supra*, a los Centros Médicos Académicos Regionales y a su personal médico-docente, es importante conocer la naturaleza y labor de estos centros. Procedemos, pues, a ir sobre ello.

C.

De entrada, y sobre el particular, es menester comenzar señalando que la creación de los Centros Médicos Académicos

Regionales, por parte de nuestra Asamblea Legislativa, persigue trabajar con varios intereses públicos que se relacionan entre sí. Estos son: (1) reconocer la responsabilidad del Estado en la educación profesional de la salud; en específico, en la educación médica y en estimular el desarrollo de la docencia, la investigación clínica, epidemiológica y sociomédica, y servicios en ciencias de la salud;[12] (2) fortalecer y desarrollar un sistema integrado de salud pública; (3) ofrecer y brindar servicios de salud costo efectivos, accesibles y de buena calidad a todas las personas por igual, independientemente de su raza, sexo, creencias religiosas y políticas; (4) fortalecer y desarrollar los programas de educación para los profesionales de la salud; y (5) estimular el desarrollo investigativo y ofrecer servicios de salud, entre otros fines. Arts. 2 y 5, *Ley de los Centros Médicos Académicos Regionales*, 24 LPRA sec. 10031 nota y 10033.[13]

---

[12] En *Rodríguez Figueroa v. Centro de Salud Mario Canales Torresola*, 197 DPR 876, 882 (2017) establecimos que los Centros Médicos Académicos Regionales tenían el propósito de ser utilizados para desarrollar programas de internado y residencia para los profesionales de la salud en práctica. *Véase*, además, Exposición de Motivos, Ley Núm. 103 de 27 de junio de 2011 (en adelante, "Ley Núm. 103-2011"). Asimismo, señalamos que, con la creación de este tipo de centros, se pretendía evitar poner en riesgo las acreditaciones de los programas existentes y evitar el éxodo de profesionales de la salud. *Íd.*

[13] Recientemente, mediante la Ley Núm. 94 de 8 de agosto de 2023 (en adelante, "Ley Núm. 94-2023"), el Legislador y la Legisladora reafirmaron los propósitos que cumplen los Centros Médicos Académicos Regionales en nuestro País. Ello, al expresar que, a través de la ley que los crea, se "ha logrado el objetivo de mantener e incrementar el número de médicos docentes que colaboran en los programas de enseñanza, así como aumentar los médicos residentes y aumentar los programas de residencia en Puerto Rico." Exposición de Motivos, Ley Núm. 94-2023, *supra*. Además, se identificó que gracias a estos centros se lograron añadir residencias e internados adicionales, aumentando así el número de practicantes médicos en nuestro País. *Íd.*

A esos efectos y reconociendo que para lograr lo anterior era necesario proteger a su personal médico-docente, es que la Asamblea Legislativa decidió extenderle a este tipo de centro los límites de responsabilidad civil que, en determinados escenarios, cobijan al Estado. El éxito de estos centros y su buen funcionamiento "dependerá en gran medida de que se les extienda a [éstos] los límites de responsabilidad civil por impericia profesional médico-hospitalaria ("malpractice"), a los que está sujeto el Gobierno de Puerto Rico", sentenció el legislador y la legisladora. Exposición de Motivos, Ley Núm. 103 de 27 de junio de 2011.

Siendo ello así, es forzoso concluir que, el carácter personalísimo de la defensa de los límites de responsabilidad estatutarios cobra mayor visibilidad en lo relacionado a los Centros Médicos Académicos Regionales. Lo anterior es así, puesto que, la extensión excepcional de dichos límites a estos centros se basó, precisamente, en su peculiaridad y en la necesidad de que les protegiera tal beneficio para su mejor funcionamiento, a la luz de las tareas que están llamados a realizar.

**Ahora bien, ¿les beneficiaría igualmente la extensión de dichos límites de responsabilidad gubernamental a las compañías aseguradoras de estos centros y/o de sus médicos-docentes? A nuestro juicio, no. Explicamos por qué.**

III.

A.

Como se sabe, y en lo relacionado a los asuntos aquí bajo estudio, la relación entre los Centros Médicos Académicos Regionales y sus compañías aseguradoras es una que está regulada por el Código de Seguros, 26 LPRA sec. 101 *et seq*. En dicho cuerpo legal es que se exige a cualquier institución hospitalaria o profesional de servicios de salud a, en el desempeño de sus funciones, tener un seguro de responsabilidad médico-hospitalaria.

En esa dirección, el Código de Seguros, *supra*, define el concepto de *seguro de responsabilidad profesional médico-hospitalaria* como: "la cubierta de seguros de responsabilidad profesional para cubrir riesgos de daño por culpa o negligencia por impericia profesional (*malpractice*) para profesionales de servicios de salud e instituciones de cuidado de salud que se establece en este capítulo". Art. 41.010, Código de Seguros, 26 LPRA sec. 4102(7).[14] Sobre el alcance de este tipo de seguro, el Art. 41.050 del Código de Seguros, *infra*, al momento de la presentación de la demanda que hoy nos ocupa, establecía, lo siguiente:

---

[14] En el pasado, hemos reconocido que los contratos de seguro gozan de un alto interés público por su importancia, complejidad y efecto en la economía y la sociedad. *Birriel Colón v. Econo y otros*, 213 DPR 80, 92 (2023); *Con. Tit. Acquamarina et al. v. Triple-S*, 210 DPR 344, 357 (2022); *San Luis Center Apts. et al. v. Triple-S*, 208 DPR 824, 831 (2022); *Maderas Tratadas v. Sun. Alliance*, 185 DPR 880, 896 (2012). Este alto interés público es aún más evidente en cuanto a los seguros de responsabilidad médico-hospitalaria, pues éstos posibilitan la solvencia de los profesionales e instituciones de cuidado de la salud en beneficio de los pacientes afectados por actos de impericia profesional. *Jiménez López v. SIMED*, 180 DPR 1, 9 (2010); *Acevedo Mangual v. SIMED*, 176 DPR 372, 385 (2009).

**Todo profesional de servicios de salud e institución de cuidado de salud deberá radicar anualmente prueba de su responsabilidad financiera por la cantidad de cien mil (100,000) dólares por incidente o hasta un agregado de trescientos mil (300,000) dólares por año. El Comisionado podrá requerir límites hasta un máximo de quinientos mil (500,000) dólares por incidente médico y un agregado de un millón (1,000,000) de dólares por año, en los casos de instituciones de cuidado de salud** y de aquellas clasificaciones tarifarias de profesionales de servicios de salud dedicados a la práctica de especialidades de alto riesgo, previa celebración de vistas públicas en las que tales profesionales e instituciones o cualquier otra persona interesada tengan la oportunidad de comparecer a expresar sus puntos de vista sobre el particular y a presentar cualquier información, documentos o estudios para sustentar su posición. Están exentos de esta obligación aquellos profesionales de servicios de salud que no ejercen privadamente su profesión y trabajan exclusivamente como empleados de instituciones de cuidado de salud privadas, siempre y cuando estuvieren cubiertos por la prueba de responsabilidad financiera de estas. También están exentos de esta obligación los profesionales de servicios de salud que presten servicios exclusivamente como empleados, funcionarios, agentes, consultores o contratistas del Gobierno del Estado Libre Asociado de Puerto Rico, sus dependencias, instrumentalidades y municipios, siempre que no ejerzan privadamente su profesión. Están exentas, además, las instituciones de cuidado de salud que pertenezcan y sean operadas o administradas por el Estado Libre Asociado de Puerto Rico, sus dependencias, instrumentalidades y municipios.

[…]

**Se aplicarán los límites de responsabilidad que [la *Ley de Pleitos contra el Estado*], impone al Estado Libre Asociado de Puerto Rico, en similares circunstancias, en los siguientes escenarios:**

[…]

(7) **a los Centros Médicos Académicos Regionales de Puerto Rico, sus estudiantes y miembros de facultad cuando recaiga sentencia por actos constitutivos de impericia médica hospitalaria (*malpractice*) cometida por sus estudiantes y miembros de su facultad en el desempeño de sus**

**funciones docentes** […] (Énfasis suplido). 26 LPRA
sec. 4105.

Es decir, de conformidad con la normativa antes expuesta,
todo profesional de la salud, así como toda institución
hospitalaria, deberá adquirir anualmente un seguro de
responsabilidad médico-hospitalaria por la cantidad de cien
mil dólares ($100,000.00) por incidente o por un agregado de
trescientos mil dólares ($300,000.00) por año. Tal requisito,
-- entiéndase, el de adquirir un seguro de responsabilidad
médico-hospitalaria anualmente --, aplicará a los Centros
Médicos Académicos Regionales y a su personal médico-docente,
quienes serán beneficiarios de los límites de responsabilidad
establecidos en la *Ley de Pleitos contra el Estado*, *supra*,
cuando recaiga, contra alguno de éstos, una sentencia por actos
constitutivos de impericia cometida por alguno de los miembros
de su facultad médica, o de sus estudiantes, en el desempeño
de sus funciones.

**Hasta el momento, y como se puede apreciar, la legislación
objeto de estudio nada dispone respecto a la aplicación de los
límites de responsabilidad a las compañías aseguradoras de los
Centros Médicos Académicos Regionales y sus médicos-docentes.**
Estamos, pues, ante un silencio en el derecho que nos llama a
atribuirle significado a ese hecho. E. Rivera Ramos, *El derecho
y el silencio*, 15 Rev. Acad. Puert. De Jur. y Leg. 6, 14
(2017).

B.

Sabido es que, en esa tarea, -- es decir, en la evaluación de una ley que guarda silencio sobre cierto asunto --, los jueces y juezas deben determinar si tal silencio corresponde a una laguna involuntaria por parte de nuestra Asamblea Legislativa o si, por el contrario, estamos ante una omisión intencional por parte de ésta. *Acevedo Arocho v. Departamento de Hacienda*, 212 DPR 335, 358 (2023); J.M. Farinacci Fernós, *Hermenéutica puertorriqueña: Cánones de interpretación jurídica*, San Juan, Editorial, InterJuris, 2019, pág. 156. Al adentrarse en esa tarea, el jurista o la jurista debe, en primer lugar, recurrir al texto del estatuto. *Íd*. En segundo lugar, al historial legislativo. *Íd*.

**Realizado el ejercicio antes mencionado, de determinarse que se trata de una omisión intencional, lo que procede es dar fiel cumplimiento a la voluntad legislativa y, en consecuencia, no añadir lo omitido**. *Acevedo Arocho v. Departamento de Hacienda*, *supra*; Farinacci Fernós, *op. cit.*, pág. 156. Es decir, en esas ocasiones, no nos queda más que tomar en cuenta el hecho del silencio sobre ese particular como indicación de la intención del creador de la norma.[15] Rivera Ramos, *supra*, pág. 14.

---

[15] A modo de ejemplo, cuando la Asamblea Legislativa opta por mencionar o aclarar alguna cosa, palabra o concepto específico, se entienden excluidas aquellas que no fueron mencionadas. *Acevedo Arocho v. Departamento de Hacienda*, *supra*.

C.

Habiendo realizado el ejercicio de interpretación hermenéutica antes señalado, en lo relacionado a las disposiciones legales aquí bajo análisis, podemos concluir que el excluir a las compañías aseguradoras de los Centros Médicos Académicos Regionales y/o del personal médico-docente que allí labora, como beneficiarias de los límites de responsabilidad aplicables al Estado, es una omisión voluntaria por parte de nuestra Asamblea Legislativa. Dos son las razones que nos hacen llegar a esa conclusión.

En primer lugar, en varias ocasiones, la Asamblea Legislativa se ha dado la tarea de aclarar a quiénes les aplican los topes de responsabilidad de la *Ley de los Centros Médicos Académicos Regionales*, *supra*, y nunca ha decidido extender expresamente dichos límites a las compañías aseguradoras de quienes se beneficien directamente de éstos.[16] Ello, por sí solo, sería suficiente para disponer, en parte, del asunto ante nuestra consideración.

Ahora bien, como si lo anterior no fuese suficiente, un estudio detenido de las disposiciones del Código de Seguros, *supra*, también nos lleva a la misma conclusión. En particular, el Art. 20.030 de la referida disposición legal, establece que cuando se inste acción directa contra una aseguradora, ésta estará impedida de interponer aquellas defensas personales de

---

[16] *Véase*, enmiendas realizadas a la *Ley de Centros Médicos Académicos Regionales*, *supra*, y al Código de Seguros, *supra*, a través de la Ley Núm. 103-2011, *supra* y la Ley Núm. 94-2023, *supra*.

su asegurado. 26 LPRA sec. 2003.[17] **De igual manera, el Art. 20.050 del Código de Seguros, establece una prohibición expresa a que las aseguradoras puedan levantar para su beneficio las defensas de inmunidad gubernamental de sus asegurados.** 26 LPRA sec. 2004.[18]

---

[17] En específico, el mencionado artículo dispone:

> Artículo 20.030. — Litigios contra Asegurado, Asegurador.
>
> […]
>
> (2) **En una acción directa incoada por la persona que sufriere los daños y perjuicios contra el asegurador, éste está impedido de interponer aquellas defensas del asegurado basadas en la protección de la unidad de la familia u otras inmunidades similares que estén reconocidas en el ordenamiento jurídico de Puerto Rico.** […] (Énfasis suplido). 26 LPRA sec. 2003.

Cónsono con lo anterior, en el pasado hemos resuelto que las aseguradoras están impedidas de interponer aquellas defensas puramente personales del asegurado. *Rodríguez v. Integrand Assurance Company*, 196 DPR 382, 393 (2016); *Torres Pérez v. Colón García*, 105 DPR 616, 627 (1977); *Cortés Román v. Estado Libre Asociado De Puerto Rico,* 106 DPR 504, 506; *Vázquez v. Northern Assurance Co.*, 92 DPR 245, 253 (1965).

[18] Sobre el particular, el precitado artículo expresa:

> Artículo 20.050. — Seguro de Responsabilidad Sobre Entidades Públicas.
>
> (1) La obtención de un seguro de responsabilidad por el Estado Libre Asociado de Puerto Rico, sus dependencias o entidades, y por los municipios y otras subdivisiones políticas, no constituirá ni se estimará que constituye una renuncia de inmunidad gubernamental, si la hubiere, en la responsabilidad por actos u omisiones en que hubiere mediado culpa o negligencia por agentes y empleados públicos, excepto hasta el grado de la indemnización cobrable real y efectivamente provista por dicho seguro en cuanto a un suceso en particular. Sin embargo, no se considerará que existe tal renuncia de inmunidad en cuanto a ninguna reclamación o demanda contra tal entidad pública, a menos que dicha entidad renuncie expresamente a la inmunidad.
>
> (2) **Todas dichas pólizas de seguro deberán disponer que el asegurador no podrá aducir la defensa de inmunidad gubernamental en ninguna acción incoada contra el asegurador con arreglo a dicha póliza o en virtud de la misma.**
>
> (3) El asegurador no tendrá ningún derecho de subrogación contra ninguna entidad gubernamental, ni sus agentes o empleados, asegurados con arreglo a dicha póliza, en virtud de pérdida pagada por el asegurador de acuerdo a la misma. Sin embargo, se dispone que de existir otro seguro de responsabilidad cobrable provisto por otro asegurador, el

Por tanto, hasta aquí, queda meridianamente claro que los límites de responsabilidad establecidos en la *Ley de Pleitos contra el Estado*, *supra*, y, por consiguiente, en la *Ley de los Centros Médicos Académicos Regionales*, *supra*, no aplican a las compañías aseguradoras de los Centros Médicos Académicos Regionales y/o al personal médico-docente que se benefician de forma directa de esta defensa.[19]

**Establecido lo anterior, ¿cuál sería el efecto, entonces, de una cláusula en una póliza de seguros que intenta evadir el cumplimiento con el mencionado ordenamiento jurídico, al permitir que la compañía aseguradora restrinja, -- <u>sin hacer excepción alguna</u> --, su responsabilidad hasta los límites de**

---

asegurador podrá subrogarse contra este otro asegurador. (Énfasis suplido). 26 LPRA sec. 2004.

[19] **Sobre el particular, véase, de manera persuasiva, lo resuelto en *Rodríguez v. Maryland Casualty Co.*, 369 F. Supp. 1144 (DPR 1971), un caso de impericia médica llevado directamente contra la aseguradora de un hospital municipal, al cual, en aquel momento, le aplicaba un límite de responsabilidad civil de treinta mil dólares ($30,000.00) bajo la Ley Núm. 142 de 21 de julio de 1960, mejor conocida como la *Ley Municipal*, 21 LPRA sec. 1603 (derogada). Allí, la Corte de Distrito de los Estados Unidos para el Distrito de Puerto Rico resolvió que el límite de responsabilidad estatutario de dicha ley no le era de aplicación a la compañía asegurada, pues este límite se creó para beneficio y protección de los municipios, por lo que era de aplicación únicamente a éstos. Dicho foro enfatizó que no se pretendía que tales límites se aplicaran o beneficiaran a las compañías de seguros. A interpretación de ese tribunal, nuestra legislatura tenía buenas razones para limitar la cuantía de daños en las acciones contra los municipios, pero ciertamente minimizar la cobertura de seguros no era una de éstas. *Rodríguez v. Maryland Casualty Co.*, *supra*, pág. 1145.**

**En la misma línea, y de gran pertinencia para el presente caso, la Corte de Distrito de los Estados Unidos para el Distrito de Puerto Rico entendió que la sección que habilitaba los límites de responsabilidad del municipio debía leerse junto con la Sec. 2004 del Título 26 del Código de Seguros, *supra*. Sobre esto, el foro entendió que, si la póliza entre las partes tenía la intención de colocar la compañía aseguradora en la misma posición que el municipio, ello no se podía permitir; más aún cuando el municipio había comprado un seguro en exceso de los límites de responsabilidad de los cuales se beneficiaba. *Rodríguez v. Maryland Casualty Co.*, *supra*.**

**responsabilidad estatal aplicables a su asegurado? A nuestro juicio, tal cláusula pudiese ser considerada nula.**

IV.

Como bien es sabido, una póliza es el documento escrito en el que se expresan los términos de un contrato de seguro. Art. 11.140, Código de Seguros, 26 LPRA sec. 1114. En específico, el contrato de seguros es aquel "mediante el cual una persona se obliga a indemnizar a otra o a pagarle o a proveerle un beneficio específico o determinable al producirse un suceso incierto previsto en el mismo." Art. 1.020, Código de Seguros, 26 LPRA sec. 102.

En reiteradas ocasiones, este Tribunal ha señalado que, al momento de interpretar este tipo de contratos, el juez o jueza debe acudir, en primera instancia, al Código de Seguros, *supra*, pues es allí donde se recoge la norma de hermenéutica que ha de regir al llevar a cabo nuestra función interpretativa de las cláusulas contenidas en una póliza de seguro. *San Luis Center Apartments v. Triple-S Propiedad, Inc.*, 208 DPR 824, 832 (2022); *Maderas Tratadas v. Sun. Alliance,* 185 DPR 880, 897 (2012); *Echandi Otero v. Stewart Title Guaranty Co.*, 174 DPR 355, 369 (2008). Sobre el particular, el Art. 11.250 del Código de Seguros, *infra*, establece que:

> [t]odo contrato de seguro deberá interpretarse globalmente, a base del conjunto total de sus términos y condiciones, según se expresen en la póliza y según se hayan ampliado, extendido, o modificado por aditamento, endoso o solicitud adherido a la póliza y que forme parte de ésta. 26 LPRA sec. 1125.

A su vez, y, de otra parte, en esa labor interpretativa, el jurista o la jurista debe tomar en consideración que hemos catalogado los contratos de seguros como unos de adhesión. *Con. Tit. Acquamarina et al. v. Triple-S*, *supra*, pág. 358; *San Luis Center Apts. et al. v. Triple-S*, *supra*, pág. 833; *Maderas Tratadas v. Sun Alliance*, *supra*, págs. 898-899. Lo anterior así, puesto que en estos acuerdos es el asegurador quien redacta íntegramente toda su extensión, sin que el asegurado tenga oportunidad de negociar el contenido. R. Cruz, *Derecho de seguros*, San Juan, Publicaciones JTS, pág. 12 (1999). Es por eso que, de existir en la póliza una cláusula dudosa o ambigua, la misma debe ser interpretada en contra del asegurador, -- la parte que redactó el contrato --, y en favor del asegurado. *Con. Tit. Acquamarina et al. v. Triple-S*, *supra*; *Maderas Tratadas v. Sun Alliance*, *supra*; Art. 1248 de la Ley Núm. 55-2020, también conocida como el *Código Civil de Puerto Rico* (en adelante, "Código Civil de 2020"), 31 LPRA sec. 9802; R. Cruz, *op. cit.*, págs. 13, 34.

Por último, y en cuanto a este extremo de nuestro análisis, debemos recordar que, como todo contrato, el contrato de seguro constituye la ley entre las partes. *Carmen Carrasquillo Pérez v. Asociación Consejo de Titulares del Condominio Parque 352*, 2024 TSPR 101, 214 DPR ___ (2024), 13-14; *San Luis Center Apartments v. Triple-S Propiedad, Inc.*, *supra*, pág. 832; *Efraín Echandi v. Stewart Title Guaranty Co.*, 174 DPR 355, 369 (2008); *Wanda Monteagudo Pérez v. Estado Libre Asociado de Puerto Rico*, 172 DPR 12, 20 (2007). Esto quiere

decir que, **como regla general, y en la medida de lo posible, se hará valer la voluntad de los contratantes, según expresado en el referido contrato**, *Carmen Carrasquillo Pérez v. Asociación Consejo de Titulares del Condominio Parque 352*, *supra*, pág. 13; *Jiménez López v. SIMED*, *supra*, pág. 10; *López v. Atlantic Southern Ins. Co.*, 158 DPR 562, 569 (2003), **siempre y cuando el acuerdo no vaya en contra de la ley, la moral o el orden público**. Art. 1207, Código Civil de Puerto Rico de 1930, 31 LPRA sec. 3372 (derogado).[20]

**Recordemos que toda cláusula contraria a la ley,[21] la moral o el orden público se considera nula**. *De Jesús González v. Autoridad de Carreteras*, 148 DPR 255, 264 (1999); *Serra v. Salesian Society*, 84 DPR 322 (1961); *Pagán v. Sucn. Padilla*, 42 DPR 968, 975 (1931); Art. 342, Código Civil de 2020, 31 LPRA sec. 6312. De esto se trata, en parte, el caso de marras.

En cuanto a esto último, y como se deriva de todo el análisis legal antes expuesto, en nuestro ordenamiento jurídico está prohibido, por ley y por jurisprudencia, que las aseguradoras, cuando sean demandadas directamente por daños y perjuicios, interpongan aquellas defensas personales de su

---

[20] La disposición equivalente en el Código Civil de 2020 es el Art. 1232, 31 LPRA sec. 9753.

[21] En específico, toda cláusula contraria a la ley imperativa será nula. *Rodríguez Vélez v. Bahía Park*, 180 DPR 340 (2010); *Vélez López v. Izquierdo Stella*, 162 DPR 88, 99 (2004); *Berrocales Gómez v. Tribunal Superior*, 102 DPR 224, 227 (1974); Art. 342, Código Civil de 2020, 31 LPRA sec. 6312. La ley imperativa es aquélla que manda o prohíbe una conducta, de tal manera que no puede incumplirse o modificarse por voluntad de los particulares, tampoco se puede eludir su cumplimiento. Exposición de motivos, Código Civil de 2020, *supra*. Ésta se diferencia de la ley dispositiva que reconoce a los particulares la posibilidad de excluir su aplicación dentro de los límites de la autonomía de la voluntad, sin contravenir la moral ni el orden público. *Íd.*

asegurado, entre ellas, los límites de responsabilidad estatutarios. Lo anterior, toda vez que dichos límites, -- los que responden a un interés público de superior jerarquía --, se crearon para proteger a sus beneficiarios directos, y no a sus compañías aseguradoras.

En ese sentido, una cláusula dentro de una póliza de seguros que restringe, -- **<u>sin hacer excepción alguna</u>** --, la responsabilidad de la aseguradora hasta la cantidad que su asegurado esté obligado a pagar conforme a los límites de responsabilidad estatutarios tiene el efecto práctico de esquivar el cumplimiento de la prohibición legal existente. Por tal razón, la misma podría considerarse nula.

Es, pues, a la luz de la normativa antes expuesta que procedemos, desde la concurrencia, a disponer de la controversia ante nos.

## V.

Como mencionamos anteriormente, en el presente caso, la señora Lugo Ramos aduce que el Tribunal de Apelaciones erró al resolver que, de en su día recaer una sentencia contra el doctor Soler Bernardini y el Hospital San Lucas, SIMED y Beazley responderían hasta las cantidades que sus asegurados estarían legalmente obligados a resarcir, -- entiéndase, hasta los respectivos límites de responsabilidad estatutarios --, a la luz de lo pactado en sus respectivos contratos de seguro. Le asiste la razón.

Y es que, como ha quedado aquí claramente demostrado, en nuestro ordenamiento jurídico está prohibido, por ley y por

jurisprudencia, que las compañías aseguradoras, cuando sean demandadas directamente por daños y perjuicios, interpongan aquellas defensas personales de su asegurado, entre ellas, los límites de responsabilidad estatutarios establecidos en la *Ley de Pleitos contra el Estado*, *supra*, y, por consiguiente, en la *Ley de los Centros Médicos Académicos Regionales*, *supra*. Lo anterior, toda vez que dichos límites, -- unos que responden a intereses públicos de superior jerarquía --, se crearon para proteger a sus beneficiarios directos, y no a sus compañías aseguradoras.

En ese sentido, una cláusula dentro de una póliza de seguros que, según redactada, restringe, -- **<u>sin hacer excepción alguna</u>** --, la responsabilidad de la aseguradora hasta la cantidad que su asegurado esté obligado a pagar conforme a los límites de responsabilidad estatutarios de la *Ley de Pleitos contra el Estado*, *supra*, y, por consiguiente, en la *Ley de los Centros Médicos Académicos Regionales*, *supra*, tiene el efecto práctico de esquivar el cumplimiento de la prohibición legal existente. Por tal razón, la misma pudiese ser considerada nula.

No podían SIMED y Beazley argumentar que, conforme a los contratos suscritos con el doctor Soler Bernardini y el Hospital San Lucas, respectivamente, éstas solo responderían hasta la cantidad que su asegurado venga legalmente obligado a resarcir, -- entiéndase, hasta los límites de responsabilidad de la *Ley de Pleitos contra el Estado*, *supra*, y, por consiguiente, en la *Ley de los Centros Médicos*

*Académicos Regionales*, *supra*, que éstos son beneficiarios --. Muchos, como hemos visto, son los intereses públicos en juego aquí que nos mueven a tajantemente rechazar tan acomodaticia invitación. El error señalado fue cometido.

VI.

Por los fundamentos antes expuestos, y como ya adelantamos, es que concurrimos con el resultado al que hoy llega una mayoría de este Tribunal.


Ángel Colón Pérez
Juez Asociado